Case No. 1:15-cv-01273-PLM-RSK

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

DAVID W. CHARRON,

     Appellant/Defendant

v

GLENN S. MORRIS and THE
GLENN S. MORRIS TRUST

     Appellants/Plaintiff

Bankruptcy Adversary Proceeding No.
15-80086

Hon. Paul L. Maloney
Lower Case No: BG 14-07970

Nature of Suit: 422 Bankruptcy Appeal

_____/

Eric D. Carlson (P60277)
Ronald J. Spinner (P73198)
Stanley J. Stek (P29332)
Miller Canfield Paddock and Stone PLC
Attorneys for Appellees Glenn S. Morris
and The Glenn S Morris Trust
150 West Jefferson, Suite 2500
Detroit, MI   48226-4415
(313) 496-7829
carlson@millercanfield.com
spinner@millercanfield.com
stek@millercanfield.com

Perry G. Pastula ( P35588)
Dunn Schouten & Snoap, PC
Attorneys for Appellant David W. Charron
2745 DeHoop Ave., SW
Wyoming, MI 49509
(616) 538-6380
bankruptcy@dunnsslaw.com

Daniel M. LaVille
U.S. Bankruptcy Court
One Division Ave. N Room 200
Grand Rapids, MI 49503-3132
(616) 456-2693
bkappeals@miwb.uscourts.gov

_____/

**APPELLANT'S BRIEF**

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

JURISDICTIONAL STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

STATEMENT WITH RESPECT TO ORAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . viii

STATEMENT OF ISSUES PRESENTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
    1.    The Bankruptcy Code Sets a High Standard for Section 523(a)(6) . . . . . . . . . . 12
    2.    §523(a) Does Not Make 'Contempt' Sanctions Nondischargeable *Per Se* . . . . . 14
    3.    Charron's Conduct Was Adjudged to Have Not Injured Morris . . . . . . . . . . . . 16
    4.    Charron's Debt Does Not Represent Indemnification Damages. . . . . . . . . . . . 18
    5.    The State Court Determinations That Charron's Debt Did Not Represent . . . . . 21
        Compensation to Morris for Injury Collaterally Estops Morris
        From Asserting Otherwise. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
    6.    The Contempt Sanction in *In re Musilli* Represents Indemnification
        Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
    7.    *In re Suarez* Supports a Discharge of the Charron Debt. . . . . . . . . . . . . . . . . 25
    8.    It Was Improper For the Bankruptcy Court To Make Factual
        Findings for the Purpose of Imputing to Charron a "Willfull and
        Malicious" Intent to Injure Morris . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
        a.    The State Court Opinions Do Not Say Charron Acted
            With Willful and Malicious Intent to Injure Morris, Nor
            That He Targeted Morris For Harm . . . . . . . . . . . . . . . . . . . . . . . . 27
        b.    The MSG Stock Morris Held As Collateral Had No Value
            Before The Asset Sale . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .27
        c.    The Court of Appeals Made Charron's Knowledge of the
            Injunction and Intent to Disobey the Injunction Irrelevant. . . . . . . . . . 28
        d.    Errors in Legal Judgment Do Not Indicate An Intent to Harm . . . . . . . 29

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

ADDENDUM CONCERNING STATUTES AND RULES . . . . . . . . . . . . . . . . . . . . . . . A

ADDENDUM CONCERNING SIGNIFICANT CASES . . . . . . . . . . . . . . . . . . . . . . . . . B

## TABLE OF AUTHORITIES

*Cases*

*Adair v. Michigan*
    470 Mich. 105, 680 N.W.2d 386 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Alemite Mfg Corp. v. Staff*
    42 F.2d. 832 (2d Cir. 1930) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Anderson v. Liberty Lobby, Inc.*
    477 U.S. 242, 105 S. Ct. 2505 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Begin v Michigan Bell Telephone Co*
    284 Mich.App. 581, 773 N.W.2d 271 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Blonder-TongueLabs, Inc. v,. Univ. of Ill. Found*
    402 U.S. 313, 91 S.Ct. 1434 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Celotex Corp. V. Catrett*
    477 U.S. 317, 106 S.Ct.2548 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Cohen v. de la Cruz (In re Cohen)*
    523 U.S. 213, 118 S.Ct. 1212 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

*Curry v. Detroit*
    394 Mich. 327, 231 N.W.2d 57 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Davis v. Detroit Financial Review Board*
    296 Mich. App. 568, 821 N.W.2d 896 (2012) . . . . . . . . . . . . . . . . . 9,11,12,15, 20,21,23

*District of Columbia Court of Appeals v. Feldman,*
    460 U.S. 462, 103 S. Ct.1303 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Ed Schory & Sons, Inc. v. Francis*
    226 B.R. 385 (6th Cir.BAP 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Estes v. Titus*
    481 Mich. 573, 751 N.W.2d. 493 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Gleason* v. *Thaw*
    236 U. S. 558, 35 S.Ct. 558 (1915) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Grogan v. Garner*
    498 U.S. 279, 111 S. Ct. 654 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Gursten v. Kenney*
  375 Mich. 330, 134 N.W.2d. 764 (1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Hackley v. Hackley*
  426 Mich. 582, 395 N.W.2d. 906 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Hamilton's Bogarts, Inc. v. Michigan*
  501 F.3d 644 (6th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Harvey v. Lewis (Appeal of List)*,
  10 Mich. App. 709 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*In re Bradley Estate*,
  494 Mich. 367, 835 NW 2d 545 (2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10,11, 18,19

*In re Bullock–Williams*
  220 B.R. 345 (B.A.P. 6th Cir.1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Walker v. Henderson (In re Contempt of United Stationers Supply Co.)*
  239 Mich. App. 496, 608 N.W.2d. 105 (2000) . . . . . . . . . . . . . . . . . . . . . 8, 9, 15, 18,  28

*In re Geiger*
  113 F.3d. 848 (8th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*In re Markowitz*
  190 F.3d. 455 (6th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 22, 24

*In re Nevitt*
  117 F. 448 (8th Cir. 1902) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*In re Nicodemus*
  497 B.R. 852  (B.A.P.  6th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*In Re Shaw*
  210 B.R. 992 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*In re Suarez*
  400 B.R. 732 (B.A.P. 9th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Kawaauhau v. Geiger*
  523 U.S. 57, 118 S.Ct. 974 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

*Livingston v. Transnation Title Ins. Co (In re Livingston)*
  372 Fed. Appx. 613 (6th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

iii

*McComb v. Jacksonville Paper Co*
    336 U.S. 187, 63 S.Ct. 332 (1949) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Matsushita Elect. Indus. Co. v. Zenith Radio Corp.*
    475 U.S. 574, 106 S.Ct. 1348 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Musilli v. Droomers (In re Musilli)*
    379 Fed.. Appx.. 494 (6th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24, 25

*People v. Gates*
    434 Mich.146, 452 N.W.2d. 627 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*People v. Kurz*
    35 Mich. App. 643, 192 N.W.2d. 594 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Rally Hill Productions, Inc., v. Bursack*
    65 F.3d.. 51 (6th Cir.1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Rooker v. Fidelty Trust,*
    263 U.S. 413, 44 S. Ct.149 (1923) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Semtek Int'l Inc v. Lockheed Martin Corp*
    531 U.S. 497, 121 S.Ct. 1021 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 22

*Steiner v. Best (In re Best)*
    109 Fed. Appx. 1 (6th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 24, 25

*Stoudemire v. Stoudemire*
    248 Mich.App. 325, 639 N.W.2d. 274 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*United States v. Stauffer Chemical Co.,*
    684 F.2d. 1174 (6th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*White v. Baxter Healthcare Corp.*
    533 F.3d. 381 (6th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Williams v. Mehra*
    186 F.3d. 685 (6th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Young v. United State ex rel Vuiton et Fils S.A.*
    481 U.S. 787, 107 S. Ct. 2124 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

**Federal Statutes**

11 U.S.C. § 523(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13,14

iv

11 U.S.C. § 523(a)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 11

11 U.S.C. § 523(a)(7) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

28 USCA §157(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 157(b)(2)(J) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. §1257 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

28 U.S.C. § 1334 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

***Michigan Statutes***

MCL 440.9611 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

MCL 600.1701 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

MCL 600.1721 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 18,21, 26

MCL 691.1407(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 19

***Federal Rules of Civil Procedure***

Fed. R. Civ. P. 56(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Fed. R. Civ. P. 12(a)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Fed. R. Civ. P. 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Fed. R. Civ. P. 65(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

L. Civ. R. 83.2(a) (W.D. Mich) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

***Bankruptcy  Rules***

Fed. R. Bankr. P. 7056 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Fed. R. Bankr. P. 8002(b)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

Fed. R. Bankr. P. 8003(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

***Michigan Court Rules***

MCR 2.116(c)(10) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

MCR 3.310(C)(4). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 29

***Other***

Restatement (Second) of Torts § 8A (1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

## JURISDICTIONAL STATEMENT

This action involves the disposition of a complaint challenging the dischargeability of a debt under 11 U.S.C. § 523(a)(6). This is a core proceeding under 28 U.S.C. § 157 in which a bankruptcy judge "may hear and determine... and enter appropriate orders and judgments" with respect to claims against debtors, subject to the district court's original jurisdiction and traditional appellate review. 28 U.S.C. § 157(b)(2)(J); 28 U.S.C. § 1334; L. Civ. R. 83.2(a) (W.D. Mich).

This is appeal of right under Fed. R. Bankr. P. Rule 8003(a)(1) from the following final judgment, orders or decrees of a bankruptcy court:

• Memorandum Opinion Denying Defendant's Motion for Summary Judgment and Granting Plaintiff's Cross Motion for Summary Judgment entered September 30, 2015.

• Order Denying Defendant's Motion for Summary Judgment and Granting Plaintiff's Cross Motion for Summary Judgment entered September 30, 2015.

• Memorandum Opinion Denying Debtor-Defendant's Motion to Amend the Court's Findings Under Rule 52, Amend Judgment Under Rule 59, and for Reconsideration under Rule 60 entered November 25, 2015 with additional attachment added November 30, 2015.

• Order Denying Debtor-Defendant's Motion to Amend the Court's Findings Under Rule 52 and Amend Judgment Under Rule 59 entered November 25, 2015.

• Order Denying Debtor-Defendant's Motion for Reconsideration Under Rule 60 entered November 25, 2014.

The appeal is timely because it was filed on December 8, 2015, within 14 days from the entry of the Order Denying Debtor-Defendant's Motion to Amend the Court's Findings Under Rule 52. Fed. R. Bankr. P. 8002(b)(1)(A).

## STATEMENT WITH RESPECT TO ORAL ARGUMENT

The Debtor/Appellant David W. Charron ("Charron") only requests oral argument on this application if the Court grants oral argument to Appellees Glenn S. Morris, individually and/or as trustee of the Glenn S. Morris Trust (collectively "Morris").

## STATEMENT OF ISSUES PRESENTED

I.     Whether the Morris' Complaint (Objection to Discharge) is unsustainable under 11 U.S.C. § 523 (a)(6) because the award of attorneys fees and costs does not represent compensation for wilful and malicious injury to Morris or his property?

II.    Whether Charron established genuine, material issues of fact with respect to the absence of his intent to wilfully and maliciously harm Morris which barred summary judgment on Plaintiff's Cross-Motion for Summary Judgment?

### Standard of Review

A grant of summary judgment is reviewed de novo. *White v. Baxter Healthcare Corp*, 533 F.3d.381, 389 (6th Cir. 2008); *Williams v. Mehra*, 186 F.3d.685, 689 (6th Cir. 1999)(en banc). Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issues as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The court must review all the evidence, facts and inferences in the light most favorable to the nonmoving party. *Matsushita Elect. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348 (1986). Entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct.2548 (1986).

### STATEMENT OF THE CASE

This case stems from a vexatious dispute between Morris and Robert J. Schnoor ("Schnoor"), two owners of an insurance agency formerly known as Morris, Schnoor & Gremel, Inc. ("MSG")(AP Dkt. No. 4-1, p. 1-2). The men fell into disagreement during the construction of a new corporate office space in Rockford, Michigan. (*Id.*). The disagreement came to a head when Morris filed a civil action against Schnoor and MSG, seeking an order dissolving MSG (the "2007 Action"). (*Id*, p. 4). MSG engaged C&H to defend MSG and Schnoor in the 2007 Action. They quickly

obtained a dismissal of Morris's complaint and an order compelling Morris to sell his MSG stock to Schnoor under a stockholder agreement. (AP Dkt. No. 4-1, p 2; AP Dkt. No. 13 -3).

Morris and Schnoor closed on the court ordered sale. (AP Dkt. No. 4-1, p. 2-3). Schnoor made a substantial down payment and agreed to pay the balance of the purchase price by a promissory note. (AP Dkt. No. 4-1, p. 3; AP Dkt. No. 13-5). Morris retained a security interest in the MSG stock he transferred to Schnoor, but not the company's assets, to secure the repayment of the note. (*Id.*). The 2007 Action remained open after the sale until a trial could be held to determine the amount of damage caused by Morris' breach of the stockholder agreement. (AP Dkt. No. 13-3).

In May of 2008, MSG granted C&H a junior security interest in its assets to secure the payment of fees, which arose from the 2007 Action and eight other matters the firm was handling. (AP Dkt. No. 13-13; AP Dkt. No 13-1, ¶ 3). The insurance agency's assets consisted almost entirely of the income from customer accounts. (AP Dkt. No. 4-1, p. 13). Fifth Third Bank held a senior secured position in the same assets to secure a $400,000 credit line, which became fully due each January. (AP Dkt. No. 13-1, p. 3).

The court ordered sale did not include a term preventing Morris from competing with MSG or Schnoor for insurance business. (AP Dkt. No. 13-5; AP Dkt. No. 4-1, p. 3).  Morris set up a competing insurance agency. (AP Dkt. No. 13-4; AP Dkt. No. 4-1, p.3). Morris began communicating with current MSG employees, soliciting former clients, and advertising extensively in the same geographic area as MSG. (AP Dkt. No. 13-7; AP Dkt. No. 13-8; AP Dkt. No. 13-6). There was a rapid loss of clients to Morris's agency. (AP Dkt. No. 13-10). After paying Morris $416,168, Schnoor became upset about the loss of clients and stopped making further $45,091 a month payments. (AP Dkt. No. 4-1, p. 3; AP Dkt. No. 13-6; AP Dkt. No. 13-11; AP Dkt. No. 13-12).

MSG and Schnoor attempted to obtain but were denied an injunction to prohibit Morris from

taking or having contact with agency customers. They lacked sufficient evidence that Morris had solicited customers, instead of simply competed against the agency. (AP Dkt. No. 13-12). While discovery was proceeding on new claims filed by MSG and Schnoor (AP Dkt. No. 13-11), Morris unsuccessfully attempted to hold Schnoor in contempt of court for failing to make note payments. (AP Dkt. No. 13-19). During the contempt proceeding, the trial court issued an injunction prohibiting "R. Judd Schnoor from transferring the assets of MSG outside the ordinary course of business without authorization from the Court" (the "Injunction"). (AP Dkt. No. 13 -2). Schnoor stipulated to a temporary restraint for the expected duration of the hearing — "a week or two, your Honor." (AP Dkt. No. 13-20, p. 106, line 25). For unknown reasons, the trial court issued the Injunction without a time duration. (AP Dkt. No. 13-2). Schnoor did not object. (AP Dkt. No. 13-18). Morris had no claims plead when the Injunction issued. (AP Dkt. No. 13-15, p. 14-15; ). No reasons for the injunction were given by the court in the transcript record or text of the Injunction. (AP Dkt. No. 13-2; AP Dkt. No. 13-20). The trial court did not modify the Injunction when it dismissed the contempt proceeding. (AP Dkt. No. 13-19).

Independently of the contempt proceeding, the trial court entered an order relieving Morris of his implied covenant not to solicit back the customers he had sold to Schnoor because of Schnoor's decision to not continue to pay on the note. (AP Dkt. No. 13-1, ¶ 4) . This allowed Morris, the company's co-founder, to solicit all MSG customers openly. (AP Dkt. No. 13-10).

By October of 2008, MSG found itself unable to pay its landlord, C&H, and other creditors whose debts totaled approximately $2.8 million. (AP Dkt. No. 13-1, ¶ 4; AP Dkt. No. 13-7; AP Dkt. No. 13-18; AP Dkt. No. 13-26, P. 6). The corporation's sole shareholder and executive officer, Schnoor, faced personal bankruptcy from having paid Morris for anticipated client income which never materialized. (AP Dkt. No. 13-21; AP Dkt. No. 13-23, p. 13). To further complicate matters,

-3-

C&H's other typically well paying clients stopped paying the law firm on a timely basis due to the worldwide economic collapse now known as "the Great Recession". (AP Dkt. No. 13-26, P. 5-6). Lehman Brothers, AIG, and GM failed.  World capital markets collapsed.  World credit markets froze.  Banks refused to loan other banks.  Law firm clients who had never missed a payment were having their loans called.  C&H did not believe MSG's senior secured debt would be renewed.  (AP Dkt. No. 13-26). It feared the consequences of any bank action because the law firm had no means to redeem the collateral from a bank sale. (AP Dkt. No. 13-26, P. 6).  It had exhausted its credit lines to keep its clients afloat. (AP Dkt. No. 13-23, p. 15; AP Dkt. No. 13-26, p. 5-6).

C&H believed that the best way to realize any value on its collateral was to sell the agency's accounts to someone who wanted to continue the enterprise with its existing 35-40 employees in Rockford, a so-called "friendly buyer". (AP Dkt. No. 13-26, p. 6).  Any other disposition risked the chance that the company's unprotected accounts would simply walk out the door with the employees who serviced them.  Morris had demonstrated just how easily that could happen.

On October 17, 2008, C&H formally notified MSG by letter that it could no longer continue its representation due to the law firm's perilous financial condition and MSG's inability to pay as promised.  (AP Dkt. No. 13-26, p.6, 11, ).  C&H directed MSG to find alternative counsel.  (*Id.*). It also notified MSG of the law firm's need to liquidate its collateral immediately to stay afloat and it suggested the possibility of a private sale to a friendly buyer.  (*Id.*).  This notice was given pursuant to MCL 440.9611, a provision that  requires a creditor to give the debtor reasonable notification of the time after which any private sale or other disposition is to be made.

The law firm made a concerted effort to contact employees and business associates of MSG to determine if anyone had any interest or means to purchase MSG's accounts, in whole or in part. (AP Dkt. No. 13-26). MSG's certified public accountant learned of the business opportunity and

contacted one of his clients who had no prior involvement with MSG, Schnoor, C&H, Charron, or any of the other parties. (*Id.*, p.6). The investor formed New York Private Insurance Agency, LLC ("NYPIA") and negotiated an agreement to purchase the assets from C&H for $395,000, subject to the lien and outstanding debt of the first secured party, Fifth Third Bank. (*Id.*). C&H closed on the sale November 20, 2008. NYPIA paid off the bank, as well as other MSG creditors it deemed necessary to sustain operations. (*Id.*).

On January 28, 2009, Schnoor filed for bankruptcy protection. (AP Dkt. No. 13-21).

On February 9, 2009, Charron produced the documents associated with C&H's asset sale to the trial judge in the 2007 Action and testified extensively about the reasons for the sale. (AP Dkt. No. 13-26). Charron explained the reasons why the law firm was unable to sustain the litigation during the onslaught of the Great Recession and the threat of the Fifth Third Bank note coming due. (*Id.*). More importantly, Charron testified that despite his law firm's best efforts, Morris had successfully relocated almost all his former clients to his new agency within a year following the court ordered sale. (*Id.*). The lost clients represented annual income of approximately $600,000 which equated to forty percent (40%) of the corporation's annual business receipts. (*Id.*; AP Dkt. Nos. 13, 13-1, 13-10, 13-15, 4-4, p. 54). MSG was not a viable enterprise without the lost income. (*Id.*).

Morris was not a stockholder of MSG, nor a creditor of MSG. (AP Dkt. No. 4-1, p. 3). Morris did not own or possess a claim to own the assets of MSG. (*Id.*). At all relevant times involving C&H's security interest and the law firm's ultimate asset sale, Morris only held a lien against one half of Schnoor's stock in MSG to secure Schnoor's installment note. (*Id.*; AP Dkt. No. 13-23, p. 12). Every time Morris took an MSG account without giving the corporation anything in exchange, he diminished the value of the stock he held as collateral. Charron chided Morris for

-5-

undertaking a *de facto* corporate dissolution without providing for any of the company's creditors. (AP Dkt. No. 13-26). As a result of his behavior, MSG's stock became worthless before C&H conducted its asset sale. (AP Dkt. No. 13-1, p. 4).

On February 20, 2009, Morris sued NYPIA, C&H, MSG and Charron in Kent County Circuit Court (the "2009 Action"). (AP Dkt. No. 4-3). The gravaman of Morris' complaint was that the chain of events which culminated in C&H's sale of assets to NYPIA (the "asset sale") was fraudulent or otherwise improper. (*Id.*). The complaint asserted four claims: (1) fraudulent transfer under the Uniform Fraudulent Transfer Act against all four defendants; (2) "commercially unreasonable sale" under the Uniform Commercial Code against all four defendants; (3) fraud against defendants Charron and C&H only; and (4) conversion against all four defendants. (*Id.*).[1] The Plaintiff's complaint sought damages for injuries suffered and property loss from the asset sale and the violation of the Injunction. (*Id.*). Morris alleged the Injunction and a promissory note he acquired on the date he initiated the litigation, gave him an interest in the assets of the corporation. (*Id.*). On October 22, 2009, the state trial court dismissed all of Morris' claims against Charron by summary disposition under MCR 2.116(c)(10). (AP Dkt. No. 4-2). The Court reasoned:

> "Although [Charron] was integrally involved in the transactions that gave rise to this lawsuit, there is neither a sustainable allegation in the amended complaint nor any proof in the record that [Charron] personally held, obtained, or received any assets of MSG. To be sure, he almost certainly benefitted as a partner in Charron & Hanisch when that law firm acted upon its secured interest in MSG and realized a gain of approximately $395,000 in attorney fees...but the responsibility to disgorge that money, if it was ill-gotten, rests entirely with the law firm of Charron & Hanisch, PLC, and there is no basis in the amended complaint nor in fact to support the conclusion that [Charron] converted the assets of MSG in his personal capacity. Although [Charron] was singled out in the common law fraud claim in Count Three, that claim as pleaded in the amended complaint cannot withstand [Charron's] motion

---

[1] The case is docketed as 17th Circuit Court Case No. 09-01878-CB (*See* AP Dkt. No. 4-3).

for summary disposition.  Accordingly, [Charron] is entitled to summary disposition
on all counts in his personal capacity." (*Id., p.*  p.  10-11).

Morris appealed Charron's dismissal in the 2009 Action and lost. (AP Dkt. No. 4 - 4,  p. 44-45).  In

2012, the trustee sold Schnoor's claim in the 2007 Action to Morris for approximately $10,000. (AP

Dkt. No.13-22). Morris immediately dismissed Schnoor's claims against him, thereby eliminating

any appeal of the Injunction or other unusual decisions in the case. (*Id.*). At the same time, Morris

requested and obtained an order in the 2007 Action for the purpose of compelling Charron, MSG,

C&H and NYPIA to show cause why they should not be held in contempt of court for conducting

the asset sale while the Injunction was pending. (AP Dkt. No. 4-1, p. 1).

A hearing on the new show cause order was conducted with the trial of the remaining claims

in the 2009 action against C&H and MSG.   The trial court determined that the asset sale violated

the Injunction.  (AP Dkt. No. 4-1; the "Contempt Opinion").   It reasoned that the Injunction made

the act of selling the assets of MSG prohibited not only by Schnoor but by his attorneys at C&H

because MCR 3.310(C)(4) "binds parties and their attorneys alike".(*Id.*). The law firm's pre-existing

secured relationship with MSG, a non-restrained party, was irrelevant, as was the fact that C&H did

not need either Schnoor nor MSG to effectuate an asset sale under Article 9 of the UCC. The trial

court held MSG (and Schnoor in absentia) in contempt for assisting in the law firm's concerted

effort to find a "friendly" buyer of MSG's assets. (*Id.*). [2]  The asset purchaser, NYPIA, was not held

in contempt because it was unaware of the Injunction when it purchased the assets. (*Id.*, p. 21).

The Contempt Opinion contrasted the trial court's treatment of Charron from its treatment

---

[2]On page 12 of the Contempt Opinion, the trial court says Schnoor acted in contempt of
the Injunction.  Schnoor was not tried for contempt, he was excluded from the Order to Show
Cause, and he did not defend the contempt charge or suffer any penalty. On the first page of the
Opinion in footnote 1, the trial court acknowledges that "Glenn Morris has conceded that Mr.
Schnoor is shielded from civil liability in this matter."

-7-

of C&H and MSG.  The trial court began by identifying MCL §600.1721 as the authority that permits courts to indemnify complainants "for actual loss or injury caused by a contemnor's misconduct." (*Id.*, p. 10).[3]  It then cites *In re Contempt of United Stationers* for the position that a court may indemnify a complainant "for the actual loss or injury caused by the contemnor's misconduct." (*Id.*, p. 12). The trial court added "[t]hat [this] remedy is appropriate with respect to MSG because the asset sale stripped [the Morris] of the value in [their] secured interest in 50 percent stock of MSG." (*Id.*). The trial court then ordered MSG to pay <u>50%</u> of the total damage award to Morris, as compensation for the injury caused by MSG's misconduct. (*Id.*, FN 9).

The trial court followed an identical analysis when addressing the liability of C&H,  again citing *In re Contempt of United Stationers.* (*Id.*, p. 17). It stated "[this] remedy was [also] appropriate with respect to C&H, largely because C&H's seizure and disposal of all the assets of MSG stripped [Morris] of the value in his secured interest in 50 percent of the stock of MSG." (*Id.*). The Trial Court ordered C&H to pay the other 50% of the total damage award to the Morris as as compensation for the injury caused.  (*Id.*).

The trial court characterized these sanctions against MSG and C&H as "redress for the harm resulting from the seizure and sale of MSG's assets in violation of the court order." (*Id.*, p. 21). Collectively, they total 100% (MSG 50% + C&H 50%) of the indemnification award to the Morris. (*Id.*, p. 12, 17-18, FN 14).    Pursuant to MCL § 600.1721,  Morris "[logically received] compensation for loss of value to MSG from the entities that disposed [Morris] of that value[.]" (*Id.*, p. 16). These sanctions "reflect[ed] the amount of harm done to [Morris] by the contemptuous

---

[3] "Having laid the factual foundation and set forth the governing legal principals, the Court must apply the law to the facts in order to determine who must be held responsible for civil contempt and measure of damages should be awarded to compensate [the Morris] for the loss resulting from the contemptuous behavior." (*Id.,* p. 10).

conduct." (*Id.* p. 18).

When interpreting the liability of Charron for contempt, on the other hand, the trial court did not reference MCL §600.1721, *In re Contempt of United Stationers,* compensation for "the actual loss or injury caused by the contemnor's misconduct", or any other of the standards that it applied to MSG and C&H. (*Id.*, p. 16). Instead, the trial court stated:

> "Here, [Morris] logically should receive compensation for loss of value to MSG from the entities that dispossessed [Morris] of that value, i.e., MSG and C&H. The appropriate sanction for [Charron], **in contrast,** involves "**a civil contempt sanction in the form of a compensatory award of attorney fees, other costs, or both," that [Morris] incurred in pursuing civil contempt against [Charron]. See Davis, 296 Mich App at 626.** Therefore, the Court shall direct [Charron] to compensate [Morris] **for the attorney fees and costs [Morris] incurred in the contempt trial that took place in 2011.**" (*Id.*) (Emphasis added).

The trial court followed similar reasoning to what it used to dismiss Charron from the 2009 Action. The trial court never identified Charron's Award as compensation for "the actual loss or injury caused by the contemnor's misconduct". It had previously determined in the 2009 Action that Charron's participation in the sale of MSG assets ***did not*** injure Morris. (AP Dkt. No. 4-4, p. 10-11).

The trial court conducted a hearing to determine the amount of the attorney fees and costs against Charron arising from the contempt trial that took place in 2011. It entered a $363,506.77 judgment (the "Award")(AP Dkt. No. 1-1). Once the Award was entered, Charron filed motions to request that the Award be apportioned against Morris and others under MCL § 600.2957(1), a statute which allows tort liability to be allocated among responsible parties (AP Dkt. No. 4-2, Exh. D and E). In two separate opinions, the trial court held that the Award could not be allocated because it was not a tort award or another legal theory that compensated Morris for injury to himself or his property:

> "[Charron] and C&H contend that the Court should have allocated fault among all responsible parties pursuant to MCL 600.2957(1), which states that, "[i]n an action

-9-

based on tort or another legal theory seeking damages for personal injury, property damage, or wrongful death, the liability of each person shall be allocated under this section by the trier of fact..." Because this civil contempt proceeding does not involve a request for "damage for personal injury, property damage or wrongful death," MCL 600.2957(1) has no application here." (AP Dkt. No. 4-2, Exhibit D, p. 2-3) (Emphasis added).

****

"Third, Attorney Charron and C&H assert that the recent decision of our Supreme Court in the case of *In re Bradley Estate*, 494 Mich 367 (2013) — a dispute about the nature of contempt for purposes of the Governmental Tort Liability Act ("GTLA") — obliges the Court to try this case anew in order to apportion fault under MCL 600.2957(1). To be sure, our Supreme Court concluded in *In re Bradley*, "that 'tort liability' as used in MCL 691.1407(1) means all legal responsibility arising from a noncontractual civil wrong for which a remedy may be obtained in the form of compensatory damages[,]" *In re Bradley Estate*, 494 Mich at 385, but that holding does not require the allocation of fault under MCL 600.2957(1) in this civil contempt proceeding. By its terms, MCL 600.2957(1) states that, in "an action based on tort or another legal theory seeking damages for personal injury, property damage, or wrongful death, the liability of each person shall be allocated under this section by the trier of fact..." Because this civil contempt proceeding does not involve a request for "damages for personal injury, property damage, or wrongful death," MCL 600.2957(1) has no application here." (*See* AP Dkt. No. 4-2, Exhibit E, p. 4)(Emphasis added).

The Michigan Court of Appeals came to the same conclusion as the trial court and refused to allow Charron to allocate the Award. The appellate court characterized the Award as exercise of the trial court's "inherent power to punish contempt[,] under *In re Bradley*, " as contrasted to an award designed to impose "legal responsibility in the form of compensation for the harm done[.]" (AP Dkt. No. 4-4, p. 19). The COA affirmed the trial court's contempt findings and ruling in the 2007 Action at the same time it affirmed Charron's dismissal in the 2009 Action. (*Id.*).

Charron filed for relief under Chapter 7 of the United States Bankruptcy Code on December 31, 2014. He listed the Award on his schedule of unsecured debts to be discharged. Morris filed a Complaint Objecting to Discharge on April 10, 2015. (AP Dkt. No. 1). Once again, Morris identified the asset sale as the wrongful act undertaken by Charron which caused Morris injury or loss. (*Id.*, ¶ 40-50). Specifically, Morris alleged:

-10-

"82.    At the time Charron effected the transfer of MSG assets through C&H and ultimately to NYPIA, Morris held a security interest in MSG's stock."

* * * *

"85.    Charron knew that by transferring MSG's assets to NYPIA, it was substantially certain that MSG's stock would be rendered essentially worthless."

* * * *

"93.    [The Morris'] security interest in MSG's stock constitutes a <u>property</u> interest.

94.    [Charron] thus willfully and maliciously caused injury to [the Morris'] <u>property</u>."

* * * *

"96.    Because [Charron] willfully and maliciously caused injury to [the Morris'] <u>property</u>, [Charron] is not entitled to a discharge pursuant to 11 U.S.C. § 523(a)(6)." (*See* Complaint, p. 10-11)(Emphasis added)."

* * * *

"100.    Charron willfully and maliciously caused injury to Morris' property by forcing Morris to incur litigation costs which would have been unnecessary but for Charron's actions in violation of the Restraining Order."

The claims in the new complaint were nearly identical to those found in Morris' amended complaint in the dismissed 2009 Action.   Charron did not answer the new complaint, but instead, moved for summary judgment under B.R. 7056, Fed. R. Civ. Proc. 56.   Morris filed a cross-motion for summary judgment.   The Bankruptcy Court granted the Morris cross-motion and dismissed Charron's motion.

## SUMMARY OF THE ARGUMENT

This appeal arises from a bankruptcy court determination that the Award is a non-dischargeable debt under 11 U.S.C. § 523 (a)(6).   The debt involves an award of attorneys fees and costs authorized by *Davis v. Detroit Financial Review Board*, 296 Mich. App. 568, 625; 821 N.W.2d. 896 (2012), and *In re Bradley Estate*, 494 Mich 367; 835 N.W. 2d 545 (2013) as a civil contempt sanction. For a debt to fall within a § 523 (a)(6) exception to discharge, the creditor has the burden of proving that it sustained an injury to himself or his property as a result of a willful and malicious act of the debtor.   Moreover, the debtor must subjectively intend harm to the creditor by the act, and not merely intend the act. *Kawaauhau v. Geiger*, 523 U.S. 57, 61; 118 S.Ct. 974 (1998).

-11-

Morris' Complaint identifies the "act" as the sale of the assets of MSG by C&H while the Injunction was pending, and the harm as the damage done to his lien interest in MSG stock. The same state trial courts adjudged Charron to be not responsible for these injuries in the 2009 Action. The state courts also ruled that the contempt award in the 2007 Action did not represent compensation for injury caused to Morris or his property, but rather it was an exercise of a Michigan court's "inherent power" to award fees and costs to a party who brings an act of contempt to the attention of the court under *Davis*. There is no requirement that a party be injured under *Davis* to receive an award. The violated injunction does not even have to be valid. A *Davis* award is made to preserve the dignity of the court, not to compensate for the complainant's injury.

No claim arises under §523(a)(6) in the absence of tortious injury to persons or property. The debt must "result from" the injury....not be the injury. *Cohen v. de la Cruz*, 523 U.S. 213, 118 S.Ct. 1212 (1998). There was no need for the Bankruptcy Court to analyze the "willful and malicious" nature of Charron's actions when in the exact words of the state courts, the debt did not compensate Morris for an injury. Charron qualifies for a discharge of the debt and a fresh start.

## **ARGUMENT**

1.    **The Bankruptcy Code Sets a High Standard for Section 523(a)(6).**

Section 523 (a)(6) of the Bankruptcy Code excepts from discharge "any debt – for willful and malicious injury by the debtor to another entity or to the property of another entity." In order to except a debt from discharge under section 523(a)(6), a creditor must satisfy the court that the debtor's actions were: (1) willful, (2) malicious and (3) resulted in injury to another entity or the property of another entity. *Kawaauhau v. Geiger*, 523 U.S. 57, 61; 118 S.Ct. 974 (1998):

> "The word "willful" in (a)(6) modifies the word "injury," indicating that nondischargeability takes a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury. Had Congress meant to exempt debts resulting

from unintentionally inflicted injuries, it might have described instead "willful acts that cause injury." Or, Congress might have selected an additional word or words, i. e., "reckless" or "negligent," to modify "injury." Moreover, as the Eighth Circuit observed, the (a)(6) formulation triggers in the lawyer's mind the category "intentional torts," as distinguished from negligent or reckless torts. Intentional torts generally require that the actor intend "the *consequences* of an act," not simply "the act itself." Restatement (Second) of Torts § 8A, Comment *a,* p. 15 (1964) (emphasis added).

The Kawaauhaus' more encompassing interpretation could place within the excepted category a wide range of situations in which an act is intentional, but injury is unintended, i. e., neither desired nor in fact anticipated by the debtor. Every traffic accident stemming from an initial intentional act-for example, intentionally rotating the wheel of an automobile to make a left-hand turn without first checking oncoming traffic-could fit the description. See 113 F.3d. at 852. A "knowing breach of contract" could also qualify. *Id.* A construction so broad would be incompatible with the "well-known" guide that exceptions to discharge "should be confined to those plainly expressed." *Gleason* v. *Thaw,* 236 U. S. 558, 562 (1915)."

Consistent with this reasoning, the Sixth Circuit and most federal courts require a debtor's tortious conduct to serve as the basis of an injury under §523(a)(6).   A breach of contract may not serve as the injury. *In re Best*, 109 Fed. Appx. 1, 8 (6th Cir. 2004)(holding breach of stock purchase agreement to be dischargeable); *In re Bullock–Williams,* 220 B.R. 345, 347 (B.A.P. 6th Cir.1998) (holding debt for unpaid condo dues to be dischargeable).   Moreover, "unless the actor desires to cause the consequences of his act, or ....believes that the consequences are substantially certain to result from it, he has not committed a willful and malicious injury as defined under §523(a)(6)." *In re Markowitz*, 190 F.3d. 455, 464 (6th Cir. 1999).

The phrase "debt -- for", used throughout 11 U.S.C. § 523, means a 'debt as a result of', a 'debt with respect to', and 'debt by reason of', and the like." *Cohen v. de la Cruz*, 523 U.S. 213, 118 S.Ct. 1212 (1998).   The operative element in any §523(a)(6) analysis is "<u>injury</u>".   The "debt" must be a "debt as a result of", a "debt with respect to", or a "debt by reason of" — a tortious "<u>injury</u>" to the creditor. (*Id.*).   Once it is determined that the creditor has been injured by the debtor's conduct,

the court may then determine whether the "injury" was "willful and malicious". "[T]he injury must invade the creditor's legal rights....' in the technical sense, not simply harm a person." *In re Geiger*, 113 F.3d.848, 852(8th Cir. 1997), aff'd 523 U.S. 57, 118 S.Ct.974 (1998).

## 2.     §523(a) Does Not Make 'Contempt' Sanctions Nondischargeable *Per Se.*

Congress did not exempt from discharge debts that are labeled as "contempt sanctions" nor debts which arise from the exercise of a court's power of contempt.  When the exercise of a contempt power results in an award payable to the court or another governmental authority,  11 U.S.C. §523(a)(7) exempts the debt from discharge as long as the debt does not represent compensation for actual pecuniary loss.[4] All other debts arising from contempt sanctions must rely upon other subparts of §523(a) to become non-dischargeable. Hence, an examination of the debtor's conduct,  rather than any labeling of the debt as a "contempt sanction", is the relevant inquiry of a non-dischargeability claim. A creditor like Morris has the burden to show by a preponderance of the evidence that his non-dischargeability claim fits squarely within the exception to discharge. *Grogan v. Garner*, 498 U.S. 279, 287; 111 S. Ct. 654 (1991). Exceptions to discharge under section 523(a) are narrowly construed in favor of debtors in order to promote the Bankruptcy Code's policy of providing debtors with a fresh start. *In re Nicodemus*, 497 B. R. 852, 857-858 (B.A.P. 6th Cir. 2013).

Morris alleges that §523(a)(6) is applicable to Charron's conduct and the resulting debt. The debt represents "attorney fees, other costs, or both," that Morris incurred in pursuing a civil contempt claim against Charron in the contempt trial which took place in 2011. (AP Dkt No. 1-1, p. 16).  There is no dispute that the 2008 sale of the assets of MSG by Charron's law firm, C&H, during the pendency of the Injunction, was the transaction or occurrence that  triggered the trial

---

[4] The 2007 Action contains an example of such a fine. Charron was ordered to pay $1,000 to the Court of Appeals for a comment he made in his brief.

court's exercise of contempt powers in 2013. There is also no dispute that this conduct was first described in Morris' complaint and amended complaint in the 2009 Action. (AP Dkt No. 4-3). Charron was dismissed from the 2009 Action after the state trial court found he did not cause Morris injury — willful, malicious or otherwise, and the dismissal was affirmed on appeal. (AP Dkt. Nos. 4-2, 4-4).

To the extent the unpublished authority relied upon by the Bankruptcy Court in *In re Muscilli* holds that all debts resulting from contempt are willful and malicious *per se*, and therefore non-dischargeable under §523(a)(6), the holding is erroneous. Contempt may arise from less than intentional conduct. *In re Contempt of United Stationers Supply Co. (Walker v. Henderson)*, 239 Mich App 496, 499-500 (2000). Mere negligence of the contemnor is sufficient to trigger a contempt sanction. Justice Douglas explained why in *McComb v. Jacksonville Paper Co*, 336 U.S. 187, 191 (1949) (quoted in *United Stationers Supply Co.*):

> "The decree was not fashioned so as to grant or withhold its benefits dependent on the state of mind of respondents. It laid on them the duty to obey specified provisions of the statute. An act does not cease to be a violation of a law and of a decree merely because it may have been done innocently."

Contempt may also arise even though the contemnor does not cause or intend to cause injury to the complainant. *Davis v. Detroit Financial Review Board*.

The Bankruptcy Court erred by failing to recognize how the state courts shaped the Award in the 2007 Action to be harmonious with the outcome of the 2009 Action. It ignored Charron's dismissal in the 2009 Action and did not address any of his requests for issue or claim preclusion. The Bankruptcy Court failed to analyze and apply the only authorities cited by the state trial court in support of its contempt ruling against Charron, *Davis v. Detroit Financial Review Board,* and *In re Bradley*. Both authorities are determinative of this appeal and justify the reversal.

-15-

### 3.   Charron's Conduct Was Adjudged to Have Not Injured Morris.

Essentially, Morris wants a third bite at the pie by filing the current action. Morris'

dischargeability complaint re-alleges the same transaction and occurrence as the failed 2009 Action.

The state courts previously determined that Morris was never injured by Charron.  Morris is barred

by state law principles of *res judicata* and collateral estoppel from re-asserting or re-characterizing

the dismissed claims to create liability for Charron, as well as by the *Rooker-Feldman* doctrine[5]

which prevents re-litigation of the merits of Charron's dismissal in the 2009 Action.

Principles of claim and issue preclusion are determined by adopting the law of the State in

which the rendering federal court is situated.  *Semtek Int'l. Inc. v. Lockheed Martin Corp*, 531 U.S.

497, 508 (2001).  For *res judicata* or claim preclusion to apply in Michigan, the following conditions

must be present: (1) the prior action was decided on the merits; (2) the prior decision was a final

judgment; (3) both actions contain the same parties; and (4) the issues presented in the Complaint

were or could have been decided in the prior action. *Stoudemire v. Stoudemire*, 248 Mich.App. 325,

334; 639 N.W.2d 274 (2001); *Begin v Michigan Bell Telephone Co*, 284 Mich.App. 581, 600; 773

N.W.2d 271 (2009); *Adair v Michigan*, 470 Mich. 105, 119; 680 N.W.2d 386 (2004).  As stated by

the Michigan Supreme Court in *Hackley v. Hackley*, 426 Mich. 582, 584-585; 395 N.W.2d 906

(Mich. 1986), cited with approval by *In Re Shaw*, 210 B.R. 992, 997 (1997):

> "In Michigan, the doctrine of res judicata applies, except in special cases, in a
> subsequent action between the same parties and " 'not only to points upon which the
> court was actually required by the parties to form an opinion and pronounce a
> judgment, but to every point which properly belonged to the subject of litigation, and

---

[5]*Rooker v. Fidelty Trust*, 263 U.S. 413; 44 S. Ct.145 (1923); *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 103 S.Ct.1303 (1983).  Federal District Courts are courts of original jurisdiction and they are precluded from serving as appellate courts to review state court judgments, as that appellate function is reserved to the Supreme Court under 28 U.S.C. §1257.

which the parties, exercising reasonable diligence, might have brought forward at the time.'" *Curry v. Detroit*, 394 Mich. 327, 332; 231 N.W.2d. 57 (1975), quoting *Gursten v. Kenney*, 375 Mich. 330; 134 N.W.2d. 764 (1965)."

There is no dispute that the parties to this proceeding are the same parties who were involved in the 2009 litigation. The same transaction or occurrence was involved, namely the sale of MSG assets by C&H during the pendency of the Injunction. Morris' pleadings in the 2009 litigation identified the sale of MSG assets as the cause of their alleged injuries:

> "27.   On August 22, 2008, [the Trial Court] entered an Order precluding Schnoor from selling or transferring the assets of [MSG] except as may be permitted in the normal course of MSG, Inc.'s business.
>
> ****
>
> 31.   In the course of the contempt proceedings...it was learned for the first time that on June 4, 2008, Defendant [C&H] had recorded a security interest in the assets of MSG, Inc. based on a security agreement executed on May 22, 2008, between Defendant [C&H] and Schnoor purporting to act on behalf of MSG, Inc., to secure payment of his attorney fees. All of the assets of MSG, Inc. including all contracts, receivables and intangibles were then seized by [Charron] and [C&H] after they filed a demand letter with MSG, Inc[.]
>
> ****
>
> 33.   The seized assets were then sold by [Charron] and [C&H] to Defendant New York Private Insurance Agency[.]
>
> ****
>
> 37.   After the sale of all of the assets of MSG, Inc. by [Charron] and [C&H] to New York Private Insurance....All the insurance contracts, insureds, relationships, and files of MSG, Inc...have now been transferred to the ownership and control of New York Private Insurance.
>
> ****
>
> 48.   [Morris] had an interest in the assets of MSG, Inc. by virtue of the protection afforded by the Court Restraining Order Dated August 22, 2008, his security interest in the stock of MSG, Inc. consisting of 50% of MSG, Inc., and his rights under the Promissory Note.
>
> ****
>
> 49.   ...[Charron and C&H] damaged [the Morris]." (AP Dkt. No. 4-3)

*See also* Paragraphs 32, 34, 39, 45, 46, 47, 52, 53, 54, 57, 58, 60 of the amended complaint in the 2009 action. The complaint focused on the asset sale by C&H during the pendency of the Injunction as the "transaction or occurrence" at the center of the action. The issue of whether Charron

-17-

intentionally injured Morris was decided on the merits in the prior action. (AP Dkt. No. 4-2, p. 17-18).  The answer was "no".  There was  a valid, final dismissal judgment that was affirmed by the appellate court. The outcome of the 2009 Action released Charron from liability to Morris for injury resulting from the asset sale and barred the current action which seeks a different liability determination on the formerly dismissed claims.

**4.      Charron's Debt Does Not Represent Indemnification Damages.**

The primary purpose of contempt is to preserve the effectiveness and sustain the power of the courts. *People v. Kurz*, 35 Mich. App. 643, 656 (1971).  Justice Scalia referred to this as the "power of self-defense," intended to sanction "those who interfere with the orderly conduct of [court] business or disobey orders necessary to the conduct of that business." *Young v. United State ex rel Vuiton et Fils S.A.*, 481 U.S. 787, 820-821, 107 S. Ct. 2124 (1987) (Scalia, J., concurring). Another purpose is to protect and enforce the parties' rights by compelling obedience to court orders and judgments. *Harvey v. Lewis (Appeal of List)*, 10 Mich. App. 709, 715-716 (1968), citing *In re Nevitt*, 117 F. 448 (8th Cir. 1902).

Under MCL §600.1701, a court may fine, imprison, or both, a contemnor for contempt. A court may also indemnify a complainant "for the actual loss or injury caused by the contemnor's misconduct".  MCL §600.1721*; In re Contempt of United Stationers Supply Co.*, 239 Mich. App. at 499-500.[6]  Debts arising from MCL §600.1721 ---- so-called indemnification damages ----- arise from tortious conduct. *In re Bradley Estate*, 494 Mich. 367, 390-393; 835 N.W.2d. 545 (2013).

---

[6]"If the alleged misconduct has caused an actual loss or injury to any person the court shall order the defendant to pay such person a sufficient sum to indemnify him, in addition to the other penalties which are imposed upon the defendant. The payment and acceptance of this sum is an absolute bar to any action by the aggrieved party to recover damages for the loss or injury." MCL §600.1721

The Michigan Supreme Court characterized MCL §600.1721 as seeking to impose "tort liability" because "it contains all of the elements of a tort claim in the guise of a contempt claim".[7]  (*Id.*). The relationship to tortious conduct makes indemnification damages a potential source for non-dischargeable debts under §523(a)(6).

The indemnification damages of MCL §600.1721 are payable to third parties who are harmed by the contemnor's refusal to obey a court order. They are typically the parties in a case who obtained the order at issue. In the current action, the trial judge cited MCL §600.1721 and *In re Contempt of Stationers Supply Co.*  for the proposition that MSG and C&H (but not Charron) were liable for indemnification damages which equated to 100% of Morris' losses for the disobeyed Injunction.

Michigan law also contemplates a third type of contempt sanction, which arises from the exercise of the  "inherent power" of a state court.   The state courts attributed the Award against Charron to be an exercise of this power. The Supreme Court described the source and purpose of this power in *In re Bradley Estate,* a case involving the issue of whether state courts had the power to hold governmental agencies responsible for indemnification damages under MCL §600.1721. *Bradley* held that state courts derive their "inherent power" directly from the Michigan Constitution, rather than from any legislative grant of authority.  *Bradley*, 494 Mich. at 394-395.  The chief limitation on the exercise of inherent power is that <u>it does not</u> include the power to compensate parties for contemptuous misconduct.  (*Id.*). Only the legislature can give courts that power, such

---

[7]"The first sentence of MCL §600.1721... requires that this misconduct "cause [ ]"the petitioner's actual loss or injury," thus paralleling the other two elements recognized in a traditional tort claim; causation and damages." Because the first sentence of MCL §600.1721 authorizes a court to order a contemnor to "indemnify" the petition for the loss caused by the contemptuous misconduct, the statute clearly sanctions legal responsibility, or liability, in the form of compensatory damages." *In re Bradley Estate* at 558-559.

as they have done under MCL §600.1721.  Michigan courts are prohibited from exercising their contempt powers to punish a governmental agency's contemptuous conduct through an award of indemnification damages under MCL §600.1721 because the legislature has exempted government agencies from tort awards if the agencies are engaged in the discharge of a governmental function. MCL §691.1407(1).   By definition, a debt arising from the exercise of the inherent power of the court is not "compensation for contemptuous misconduct", nor a "tort claim in the guise of a contempt claim" arising under MCL §600.1721.  This is why both state courts refused to allow Charron to allocate the Award under MCL §600.2957 and §6304.   "[B]y virtue of [MCL 600.]6304...a tortfeasor need only pay a percentage of the common liability that is proportionate to his fault." *Gerling Konzern Allgemeine Versicherungs AG v. Lawson*, 472 Mich. 44; 639 N.W.2d. 149 (2005). The Award does not represent compensation to Morris for an injury. A §523(a)(6) claim requires the debt to result from an injury.

The authority cited by the trial court in support of the Award, *Davis v. Financial Review Board* illustrates how Morris qualified for the award of fees and costs, as well as what the award represents. *Davis* involved the issue of whether the Detroit Financial Review Board (the "Review Board") was subject to the Open Meetings Act ("OMA"), and if not, whether there was a consequence to the Review Board for violating an injunction directing it to comply with the OMA. *Davis*, 296 Mich. App. at 578.  The appellate court vacated the injunction after an emergency appeal in which it held the Review Board was not subject to the OMA. *Id.* at 584, 624, 626.   More importantly for this appeal, *Davis* authorized an award of fees and costs to a citizen plaintiff for pursuing the violation of the order even though no injury or loss resulted from the violation of order, due to its invalidity. *Id.* 625-626.

*Davis* did not require a showing that the contemnor targeted or caused a legal injury to the

-20-

complainant.  The court order in *Davis* was invalid and invalid orders do not harm complainants.[8]
Bringing a violation of a court order to the attention of the trial court was the only threshold for
compensation.  The *Davis* plaintiff, like Morris, was rewarded at the discretion of the trial court for
being an interested citizen who assisted in preserving the dignity of the court.  The fee and cost
award was a sanction against Charron for impeding the court's functioning by violating an order.
Morris, like Davis, had no obligation to initiate the contempt action, nor any guaranty or expectation
that he would be rewarded for his efforts if he did.  Contrary to the Bankruptcy Court's suggestion,
this was not a choice of staying silent or seeking redress for injuries.  Morris had already gone to
court against Charron and lost.  He wasn't entitled to redress from him.

The trial court was precluded from awarding indemnification damages to  Morris against
MCL §600.1721 because *res judicata* and collateral estoppel precluded such an award. The last
sentence of MCL §600.1721 provides "the payment and acceptance of this sum is an absolute bar
to any action by the aggrieved party to recover damages for the loss or injury." The *Bradley* court
noted that "indemnification damages functions [sic] as a substitute for any underlying claim and,
thus, bars monetary recovery that could have been achieved in a separate cause of action."  494
Mich at 393.  The converse is true also.  *Res judicata* prevents a dismissed claim from serving as
the basis for a recovery under MCL §600.1721.

---

[8] *Davis* is the only reported case in the nation which penalizes a party for fees and costs
due to the violation of an invalid injunction.

5. **The State Court Determinations That Charron's Debt Did Not Represent Compensation to Morris for Injury Collaterally Estops Morris From Asserting Otherwise.**

The Bankruptcy Court committed error by ignoring the state courts' unambiguous legal and factual conclusions on the issue of what the Charron debt represents, while at the same time using using elements of the state court opinions to advance the position that the debt was something else ---- indemnification damages for a tort. The doctrine of collateral estoppel, also known as issue preclusion, "precludes relitigation of issues of fact or law actually litigated and decided in a prior action between the same parties and necessary to the judgment, even if decided as part of a different claim or cause of action."[9] *In re Markowitz*, 190 F.3d. at 461(citations omitted). The Sixth Circuit has explained that:

> "Under collateral estoppel, once an issue is actually and necessarily determined by a court f competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation.... To preclude parties from contesting matters that they have had a full and fair opportunity to litigate protects their adversaries from the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions." *United States v. Stauffer Chemical Co.*, 684 F.2d. 1174, 1180 (6th Cir. 1982) (citations omitted). "Principals of collateral estoppel apply in non-dischargeability actions." *Livingston v. Transnation Title Ins. Co. (In re Livingston)*, 372 Fed. Appx. 613, 617 (6th Cir. 2010) (citations omitted).

This Court should give preclusive effect to the state court's factual and legal findings about the nature of the Award not representing compensation for injury to Morris when Morris had a full and fair opportunity to litigate the issue, *Rally Hill Productions, Inc., v. Bursack*, 65 F.3d. 51, 53 (6th Cir.1995); *Ed Schory & Sons, Inc. v. Francis*, 226 B.R. 385, 388 (B.A.P. 6th Cir. 1998); *People*

---

[9]Although the Supreme Court used broad language to discuss the rule of preclusion in the context of res judicata, or claim preclusion in *Semtek*, its reasoning can easily be extended to collateral estoppel, or issue preclusion.  *Semtek*, 531 U.S. at 507-08.

*v. Gates*, 434 Mich. 146; 452 N.W.2d 627, 631 (1990)(citing *Blonder-TongueLabs, Inc. v,. Univ. ofIll. Found.*, 402 U.S. 313, 329; 91 S.Ct. 1434 (1971), and it is clear, definite, and unequivocal how the issue was decided. *People v. Gates*, 434 Mich. 146; 425 N.W.2d 627, 630-631 (1990), cited with approval by *In re Grenier*, 458 Fed.Appx. 436 (6th Cir.2012); *Hamilton's Bogarts, Inc. v. Michigan*, 501 F.3d 644, 650 (6th Cir.2007).[10]  The Award is purely a discretionary exercise of the state courts' "inherent power" to award fees and costs to someone who assists the court in establishing contempt. No intent to injure or injury to the complainant is required as a necessary element for recovery under *Davis,* and consequently the Award debt does not implicate §523(a)(6).

6.      **The Contempt Sanction in *In re Musilli* Represents Indemnification Damages.**

The first case relied upon by the Bankruptcy Court, *In re Mucilli*, 379 Fed. Appx. 494 (2010) is easily distinguishable from the current action because the contempt sanction in *Musilli* involved indemnification damages. The *Musilli* complainant obtained an escrow order which compelled a law firm to escrow amounts sufficient to pay a referral fee for a settlement until pending litigation resolved a dispute about an entitlement to the fee.  The law firm ignored the order and distributed money to its shareholders, rather than to the escrow. The court awarded contempt sanctions which represented the original judgment whose collection was impaired by the violation of the escrow order, plus interest costs and attorneys fees.  It is not clear what tort was involved, e.g., conversion, defalcation, or some other act of dominion over the property of the complainant. The *Musilli* court identified a non-exclusive list of misconduct that produces legal injury susceptible of a §523(a)6

---

[10] Under Michigan law, collateral estoppel "requires that (1) a question of fact essential to the judgment was actually litigated and determined by a valid and final judgment, (2) the same parties had a full and fair opportunity to litigate the issue, and (3) there was mutuality of estoppel." *Estes v. Titus*, 481 Mich. 573; 751 N.W.2d 93, 500 (2008).  The Bankruptcy Court determined all of these elements were present in this case in relation to the state court opinions.

-23-

claim: "intentional infliction of emotional distress, malicious prosecution, conversion, assault, false arrest, intentional libel, and deliberately vandalizing the creditor's premises", citing *Steiner v. Best (In re Best)*, 109 Fed.Appx. 1, 5 & n. 2 (6ᵗʰ Cir. 2004). It then pronounced that the resulting debt involved willful and malicious conduct associated with the exercise of contempt powers and was therefore non-dischargeable.

The pre-condition for the application of *Musilli's* analysis was whether the court order "made clear that 'injury [was] substantially certain to occur" should the contemnors violate it, citing *In re Markowitz*, 190 F.3d at 465, n. 10: "Despite having clear instructions from the court that the firm was to escrow funds sufficient to cover a judgment against it, Musilli and Baumgardner transferred all of the firm's assets away from the firm, including transferring a significant amount of money to themselves." The contemnors offered "no legitimate justification that might explain why their actions were not willful and malicious." *Musilli*, 379 Fed. Appx.at 499.

There is no genuine issue of material fact in this action that Charron was never given any instruction that the Injunction applied to C&H or himself. The injunctive order did not arise because of his behavior. MSG, C&H and Charron were not restrained by name in the Injunction, nor warned by the court that the Injunction prohibited an asset sale by C&H (or anyone other than Schnoor). MSG owed the debt to the law firm and the corporation had granted C&H a lien against its assets months before the Injunction arose. Neither MSG nor Schnoor were needed by C&H to transfer the assets. It held the right to transfer assets as a secured creditor.

Morris also held no pending claims in the 2007 action against anyone, including Schnoor, when the Injunction arose. All had been dismissed. There was no complaint to reference as to why Morris was being granted relief. The transcript record is devoid of any explanation of the court's intentions relative to the restraint, as well as why it was extended beyond the anticipated week or

-24-

two duration of the unsuccessful Schnoor contempt proceedings. (AP Dkt. Nos. 13-1, 13-20, 13-26).

Morris also had no interest in the assets of MSG, either as an owner or lien holder, creditor or

shareholder of the corporation.    The necessary linkage between a clear understanding of a

contemnors obligations under the Injunction and the undertaking of conduct in violation of the

Injunction is missing in this case.

Finally, unlike the lawyers in *Musilli*, Charron was sued by Morris for injury involving

conversion and other intentional torts associated with the asset sale.    Morris lost, Charron was

dismissed from the action and judicially determined not to be responsible for causing Morris injury.

*Musilli* should not have been applicable to the facts in this case.

**7.      *In re Suarez* Supports A Discharge of the Charron Debt.**

The reasoning in *In re Suarez*, 400 B. R. 732, 736-37 (9th Cir. BAP 2009), also supports

Charron's position and justifies a reversal.   Contrary to *Musilli, Suarez* recognized "Section 523(a)

does not make 'contempt sanctions nondischargeable *per se*, and neither does any other subpart of

Section 523(a)."   400 B. R. at 737.   "Whether contempt sanctions are nondischargeable accordingly

depends not on whether they are labeled as "contempt" but on whether the conduct leading to them

was 'willful and malicious'."   (*Id.*).

The *Suarez* court focused on the conduct of the debtor who ignored family court orders and

targeted the new wife of her ex-husband for intentional infliction of emotional harm (one of the torts

recognized in   *Musilli*  and *In re Best* as being worthy of a §523(a)(6) claim). The factual

circumstances of this criminal contempt case were outrageous, with a detailed analysis of the court

record leading to the conclusion that the complainant's conduct was "wilful and intentional" because

she had been repeatedly warned about and restrained from undertaking the actions she took.   Like

*Musilli*, the contemnee was imprisoned for criminal contempt due to her misdeeds.   The contempt

sanction arose under a California statute employed by the state's family courts, Cal. C.C.P §1218. (**Appendix B**). It allows a California judge to order a person who has been found guilty of contempt to pay "to the party initiating the contempt proceeding the reasonable attorneys fees and costs incurred by this party in connection with the contempt proceeding." This provision is similar to MCL §600.1721 in so much as it represents indemnification of parties who suffer losses from a person who is adjudged guilty of contempt. The *Suarez* court held that an award of fees and costs under this statute to be non-dischargeable under the facts of the case because the award resulted from the debtor's conduct to target the complainant for harm. The contempt process was utilized by the court to evidence the "willfulness" and "malice" associated with the behavior because the contemnor was repeatedly warned not to do what she did.

Once again, this case is easily distinguishable because unlike *Suarez*, Charron was adjudicated to _not_ be responsible for causing any injury to Morris from the conduct which resulted in the contempt sanction. The injunctive order did not arise from Charron's threatened conduct. He was never warned that his conduct was restrained by the Injunction. It was improper for the Bankruptcy Court to imply malice to him in the absence of the necessary conditions for doing so.

**8.    It Was Improper For the Bankruptcy Court To Make Factual Findings for the Purpose of Imputing to Charron a "Willfull and Malicious" Intent to Injure Morris.**

The standard for summary judgment is well known. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50, 105 S. Ct. 2505, 2511 (1986). All facts and related inferences are to be viewed in the light most favorable to the non-moving party. (*Id.* at 255). Charron has raised numerous fact issues with his reply brief and exhibits. Should summary judgment be denied to Charron for any reason, Morris' counterclaim should be remanded for a trial on the factual issue of whether Charron's actions were willfully and maliciously calculated to cause Morris harm.

-26-

a. **The State Court Opinions Do Not Say Charron Acted With Willful and Malicious Intent to Injure Morris, Nor That He Targeted Morris For Harm.**

The state court opinions are devoid of any statement or finding that Charron targeted Morris for harm. On the contrary, the state courts said the Award does not represent compensation to Morris for injury. No debt arises under §523(a)(6) in the absence of injury. Charron testified that none of his or C&H's actions were motivated by the intention to harm Morris: they just wanted to be paid on an uncontested debt. (AP Dkt No. 13-1). Morris was irrelevant to the decision to sell the assets of MSG to satisfy MSG's debt to the law firm. The sale was undertaken to relieve well documented macro and micro financial pressures on the law firm and the real threat that there would be nothing to sell if the law firm waited much longer to act, due to the pending balloon on the Fifth Third debt. (AV Dkt. Nos. 13 and 13-26). C&H waited to enforce its security interest until all settlement discussions had ended between Morris and its clients; C&H had maxed out its credit lines with institutional lenders to maintain the litigation and could no longer afford to continue; the debt of the secured creditor, Fifth Third Bank, which was senior to C&H's debt, was about to balloon and if foreclosed, would extinguish C&H's junior lien; and world capital markets had collapsed and froze during the Fall of 2008 in what is colloquially called the "Great Recession", leaving C&H in a cash bind. (*Id.*).

b. **The MSG Stock Morris Held As Collateral Had No Value Before The Asset Sale.**

Charron testified that the MSG stock had no value at the time of the asset sale due to Morris' action to rapidly remove forty percent (40%) of the corporation's income within a short period of time, and without giving the corporation anything in return. Creditor claims totaled at least $2.8 million by the time of the sale. (AP Dkt. No. 13-1). The State Court Opinions do not identify the value of the MSG stock held by Morris as collateral prior to the sale of MSG assets, nor the

-27-

liabilities of the corporation. Charron asked the Bankruptcy Court to acknowledge this fact in his request for Additional Findings of Fact but it refused to do so.   If the stock had no value, as Charron believed,  then it would be impossible to cause Morris injury by participating in the asset sale.

### c.   The Court of Appeals Made Charron's Knowledge of the Injunction and Intent to Disobey the Injunction Irrelevant.

On appeal in the 2007 Action, Charron challenged the trial court's factual conclusions that he knew the Injunction applied to him and C&H, and that he intentionally disobeyed  it. This challenge included the exhibits used in the Contempt Opinion to support the conclusions. The two exhibits touted as the most damning evidence actually represented the opposite position asserted by the trial court.   In Exhibit 439, Charron told opposing counsel to initiate a show cause hearing if he believed Schnoor had violated the Injunction. (AP Dkt. No. 4-1, p. 10). There was no admission that Charron was subject to or had violated the Injunction.  In Exhibit 355, Charron encouraged Schnoor to obey the Injunction with respect to MSG's contemplated  transfer of a single AIG contract to a company owned in part by Morris.  (*Id.*).  Both state courts acknowledged that Charron did not view his actions as violative of the  Injunction.[11]  The Court of Appeals essentially said the trial court's statements about Charron's intent to disobey the Injunction didn't matter to the outcome of the decision:

> "Charron's subjective view of his behavior is irrelevant because, "a finding of willful disobedience of a court order is not necessary for a finding of civil contempt."" (*Id.* p. 9) (Emphasis added).

The Court of Appeals cited *In re Contempt of United Stationers Supply Co* for the proposition that "willfulness is not a necessary element of civil contempt."  (*Id.*).

---

[11] "The Court need not excuse [the Debtor and C&H's] actions...merely because of some purported infirmity in the order[.]" (AP Dkt. No. 4-1, Exhibit B, p. 9).

The Court of Appeal's curt reply to Charron that his intentions were irrelevant should have lead the Bankruptcy Court to the conclusion that "the determination of this issue [Charron's intent to violate the Injunction] was not "necessary to the outcome of the prior proceeding". This, in turn, should have eliminated the collateral estoppel argument at the core of the Bankruptcy Court's decision. The court relied entirely upon two conclusory statements from the trial court regarding Charron's subjective intent to violate the Injunction to impute a willful and malicious intent on the part of Charron to harm Morris. Charron's intent was not necessary to the trial court's findings of contempt, and it should not have served as the basis for issue preclusion in the Bankruptcy Court's decision.

### d.       Errors in Legal Judgment Do Not Indicate Intent to Harm

Malice also should not arise because Charron held a different legal opinion than the tribunal about the propriety of his conduct. Charron agreed with Judge Learned Hand, who once said:

> "[N]o court can make a decree which will bind any one but a party; a court of equity is as much so limited as a court of law; it cannot lawfully enjoin the world at large, no matter how broadly it words its decree. If it assumes to do so, the decree is *pro tanto brutum fulmen*, and the persons enjoined are free to ignore it. Thus, the **only occasion when a person not a party may be punished, is when he has helped bring about, not merely what the decree has forbidden, because it may have gone too far, but what it has power to forbid, an act of a party.** " *Alemite Mfg Corp. v. Staff*, 42 F.2d 832, 833 (2d Cir. 1930)(Emphasis added).

Charron argued unsuccessfully that the state courts should interpret MCR 3.310(C)(4) in the same manner that federal courts interpret F R Civ P Rule 65(d), because the state rule evolved from the federal rule. The trial court was precluded from enjoining the world at large from transferring the assets of MSG. Charron's belief is relevant as to why he and C&H acted the way they did, and it raises an issue of fact concerning whether his conduct was undertaken for a purpose other than for causing injury to Morris. This factual dispute precludes summary judgment in favor of Morris.

## CONCLUSION

There is no genuine issue of fact or law that the Award did not represent compensation for legal injury to Morris or his stock interest because the Michigan Courts specifically held it did not. As the debt did not result from injury, the exception of §523(a)(6) is inapplicable. *Res judicata* and collateral estoppel prevent Morris from mischaracterizing the Award to be something other than what it was — a reward to Morris for bringing an incident of contempt to the attention of the trial court.   It is unnecessary to consider matters of intent and malice in the absence of  an injury to another entity or the property of another entity.   Charron is  entitled to a reversal of the Bankruptcy Court's decision, a dismissal of Morris' Complaint and a declaration that the debt is dischargeable. If for any reason Morris' Complaint is not dismissed, Charron has certainly raised sufficient genuine issues of material fact to warrant a trial concerning the issue of whether he "wilfully" or "maliciously" targeted Morris for harm by participating in the asset sale.

Respectfully submitted,

Dated: February 21, 2016

DUNN, SCHOUTEN & SNOAP PC
Attorneys for the Appellant David W. Charron

/s/ Perry G. Pastula
By: _____
Perry G. Pastula (P35588)
Business address:
2745 DeHoop Ave SW
Grand Rapids, MI   49509
(616) 538-6380

-30-