UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAVID W. CHARRON,

       Appellant/Defendant,

v.

GLENN S. MORRIS and
THE GLENN S. MORRIS TRUST,

       Appellees/Plaintiffs.

Case No. 1:15-cv-01273-PLM-RSK

Bankruptcy Case No. 14-07970

Bankruptcy Adv. Proceeding No. 15-80086

Honorable Paul L. Maloney

**APPELLEE GLENN S. MORRIS AND THE GLENN S. MORRIS TRUST'S
<u>BRIEF ON APPEAL</u>**

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

    Stanley J. Stek (P29332)
    Eric D. Carlson (P60277)
    Ronald A. Spinner (P73198)
    Attorneys for Glenn S. Morris and the
    Glenn S. Morris Trust
    150 West Jefferson, Suite 2500
    Detroit, MI  48226
    (313) 496-7829
    spinner@millercanfield.com

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................**Error! Bookmark not defined.**

STATEMENT REGARDING ORAL ARGUMENT................................................. iv

BASIS FOR APPELLATE JURISDICTION ........................................................... 1

COUNTERSTATEMENT OF ISSUES PRESENTED AND STANDARDS OF REVIEW ....... 2

STATEMENT AND FACTS OF THE CASE........................................................... 3

I.      INTRODUCTION ................................................................................ 3

II.     BACKGROUND ................................................................................. 3

SUMMARY OF THE ARGUMENT ................................................................... 9

ARGUMENT ............................................................................................. 12

I.      LEGAL STANDARDS ........................................................................ 12

        A.      Non-dischargeability standard for violation of court orders................ 12

                1.      Non-dischargeability standard under 11 U.S.C. § 523(a)(6)
                        generally................................................................... 12

                2.      Debts incurred for violation of protective court orders are almost
                        always non-dischargeable under 11 U.S.C. § 523(a)(6). ........... 12

                3.      Debts that are non-dischargeable under 11 U.S.C. § 523(a)(6)
                        include "any liability arising" from the prohibited conduct. ......... 14

        B.      Application of collateral estoppel to nondischargeability actions. ...... 16

        C.      Putting it all together – the *Musilli* case............................................ 17

II.     ARGUMENT ................................................................................... 19

        A.      The *Musilli* decision makes it plain that the Contempt Award against
                Charron is nondischargeable........................................................ 19

        B.      Charron's arguments do not change the outcome under *Musilli*. ........ 20

III.    CONCLUSION.................................................................................. 24

CERTIFICATE OF SERVICE ........................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alfes v. Educ. Credit Mgmt. Corp. (In re Alfes)*,
    709 F.3d 631 (6th Cir. 2013) ....................................................................2

*Alworth v. Levy (In re Levy)*,
    250 B.R. 638 (Bankr. W.D. Tenn. 2000) ...................................21, 22, 23

*Buffalo Gyn Womenservices, Inc. v. Behn (In re Behn)*,
    242 B.R. 229 (Bankr. W.D.N.Y. 1999) ..............................14, 17, 20, 23

*Candler v. Wallace Candler, Inc.*,
    365 B.R. 613 (1962)..................................................................................24

*Cohen v. de la Cruz*,
    523 U.S. 213 (1998)............................................................................15, 20

*Lowry v. Nicodemus (In re Nicodemus)*,
    497 B.R. 852 (B.A.P. 6th Cir. 2013)...................................................12, 20

*Markowitz v. Campbell (In re Markowitz)*,
    190 F.3d 455 (6th Cir. 1999) .............................................................16, 20

*Mentag v. GMAC Mortg. LLC (In re Mentag)*,
    430 B.R. 439 (E.D. Mich. 2010)................................................................1

*Morris v. Schnoor*,
    859 N.W.2d 514 (Mich. 2015)........................................................6, 20, 21

*Morris v. Schnoor*,
    Nos. 315006, 315007, 315702, and 315742, 2014 WL 2355705 (Mich. Ct.
    App. May 29, 2014) (attached to the Record at PageID 309-68) ................6, 20, 21

*Musili v. Droomers (In re Musili)*,
    379 Fed. Appx. 494 (6th Cir. 2010)................................................ *passim*

*Myers v. Internal Revenue Serv. (In re Myers)*,
    216 B.R. 402 (B.A.P. 6th Cir. 1998)..........................................................2

*Rogan v. Bank One, Nat'l Ass'n (In re Cook)*,
    457 F.3d 561 (6th Cir. 2006) .....................................................................2

*SEC v. Bilzerian*,
    613 F. Supp.2d 66 (U.S.D.C. 2009).........................................................24

*Star's Edge, Inc. v. Braun (In re Braun)*,
　327 B.R. 447 (Bankr. N.D. Cal. 2005) ............................................................15, 20

*Suarez v. Barrett (In re Suarez)*,
　400 B.R. 732 (B.A.P. 9th Cir. 2009)................................................................15, 20

*Trost v. Trost (In re Trost)*,
　510 B.R. 140 (Bankr. W.D. Mich. 2014).................................................12, 16, 22

**Statutes**

11 U.S.C. § 523(a)(6)........................................................................... *passim*

28 U.S.C. § 158(a)(1)........................................................................................1

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Glenn S. Morris and the Glenn S. Morris Trust do not believe that oral argument is necessary, but welcome the opportunity to address the Court should the Court so desire.

## BASIS FOR APPELLATE JURISDICTION

The Bankruptcy Court had jurisdiction over this matter pursuant to 28 U.S.C. § 1334, 28 U.S.C. § 157(a), and W.D. Mich. LCivR 83.2(a) and (b).  It was a core proceeding in the Court pursuant to 28 U.S.C. § 157(b)(2)(I).  Venue was proper in the Bankruptcy Court pursuant to 11 U.S.C. §§ 1408 and 1409.

The Bankruptcy Court entered its final orders on this matter on November 25, 2015, denying Defendant Charron's motions for the Bankruptcy Court to amend its judgment and to reconsider its judgment against Charron.  Charron timely filed this appeal thirteen days later.

District Courts have jurisdiction to hear "appeals from final judgments, orders, and decrees."  28 U.S.C. § 158(a)(1); *Mentag v. GMAC Mortg. LLC (In re Mentag)*, 430 B.R. 439, 443 (E.D. Mich. 2010).  This Court thus has jurisdiction over this appeal from a final judgment that a debt owed by Appellant Charron is non-dischargeable.

## COUNTERSTATEMENT OF ISSUES PRESENTED
## AND STANDARDS OF REVIEW

The issues on appeal can be stated as follows:

    (1)  Did the Bankruptcy Court correctly determine that Charron was precluded from rearguing facts that had been determined against him by the state court and further upheld on appeal; *i.e.*, that there were no genuine issues of material fact, such that a grant of summary judgment was proper?

and

    (2)  Did the Bankruptcy Court correctly determine that the state court's award of attorneys' fees and costs to Appellees/ Plaintiffs Glenn S. Morris and the Glenn S. Morris Trust and against Appellant/Defendant David W. Charron was compensation for Charron's willful and malicious injury to Morris and the Trust or their property, and thus that the state court's award comprised a nondischargeable debt for Charron?

"Conclusions of law made by the bankruptcy court . . . including the decision to grant summary judgment, are reviewed de novo." *Rogan v. Bank One, Nat'l Ass'n (In re Cook)*, 457 F.3d 561, 565 (6th Cir. 2006); *Myers v. Internal Revenue Serv. (In re Myers)*, 216 B.R. 402, 403 (B.A.P. 6th Cir. 1998). This includes a grant of summary judgment on a nondischargeability complaint. *Myers*, 216 B.R. at 403. Likewise, a bankruptcy court's application of *res judicata* is a question of law that is reviewed *de novo*. *Alfes v. Educ. Credit Mgmt. Corp. (In re Alfes)*, 709 F.3d 631, 636 (6th Cir. 2013); *Musili v. Droomers (In re Musili)*, 379 Fed. Appx. 494, 497-98 (6th Cir. 2010).

## STATEMENT AND FACTS OF THE CASE

### I.   INTRODUCTION

Although Appellant/Defendant Charron ("Charron") portrays this as a complicated case, the matter is straightforward.  Charron, an attorney, knowingly and willfully violated a state court protective order put in place to protect a company's assets.  By the time Charron was through, the assets had been disposed of and the company that had owned them had been rendered valueless.

After a trial, the state trial court held Charron in contempt and awarded Appellee/Plaintiff Glenn S. Morris and the Glenn S. Morris Trust (collectively, "Morris") damages for the injuries Charron had caused.  The judgment and award were upheld on appeal.  Charron then filed for bankruptcy protection in an attempt to evade the contempt sanction.  Unfortunately for Charron, the Bankruptcy Court, relying on the thorough record developed in the state court system, found that facts sufficient to support a nondischargeability judgment had been established.  These facts were essential to the judgment of the state trial court, and thus application of *res judicata* was appropriate.  The Bankruptcy Court thus granted summary judgment for Morris.

Charron now appeals, hoping this Court will find merit in arguments that were rejected by the state trial and appellate courts and, most recently, by the Bankruptcy Court.

### II.   BACKGROUND

The matter originally arose as a dispute in which Charron, represented R. Judd Schnoor ("Schnoor") and Morris, Schnoor & Gremel, Inc. ("MSG").   ("Record," Doc. No. 2), PageID 116-117.  The dispute was heard in the 17th Circuit Court for Kent County, Michigan ("State Court").  *Id.*, PageID 115.  Two cases represented the bulk of the dispute:  Case Number 07-6441-CR ("Case 07-6441") and Case Number 09-01878-CB ("Case 09-01878"; and collectively, the "State Court Cases").  *Id.*, PageID 115, 151.

Charron, in his summary judgment filing, acknowledged that the State Court Cases findings of facts are undisputed.  *Id.*, PageID 179, n.9.  Additionally, all appeals of the State Court Cases have been completed, at least as to the contempt finding itself if not the amount, rendering them final and unalterable.  *Id.*, PageID 177, n.6.  The following facts are taken from the State Court's findings in the State Court Cases.

In July, 2007, Morris filed Case 07-6441 seeking dissolution of MSG, an entity owned by both Morris and Schnoor.  *Id.*, PageID 116.  Charron represented Schnoor in this case.  *Id.*, PageID 117.  To resolve the matter, the Court ordered Morris to sell his stock to Schnoor for $2.5 million.  *Id.*, PageID 116.  Morris did so, receiving from Schnoor a down payment of $235,804 and a promissory note in the amount of $2,264,196 (the "Note").  *Id.*, PageID 117.  Morris retained a security interest in MSG's stock, but not in its assets.  *Id.*

Schnoor made only a few payments under the Note, then defaulted in the spring of 2008.  *Id.*  On August 20, 2008, the State Court held a hearing to determine whether Schnoor should be held in contempt for failing to pay for MSG's stock as ordered.  *Id.*  The parties agreed to entry of a protective restraining order while the State Court considered the matter, and thus, two days later, the State Court entered an order stating "that Defendant R. Judd Schnoor shall not transfer assets of Morris, Schnoor & Gremel, Inc., outside the ordinary course of business without authorization from the Court to do so" (the "Restraining Order").  *Id.*, PageID 118.  A few days later, on September 2, the State Court ordered that the Restraining Order was to "continue until further order of the Court."  *Id.*

Despite the Restraining Order, Charron almost immediately began working to transfer MSG's assets to a friendly buyer.  *Id.*, PageID 118-19.  Charron knew that the transfer of MSG's assets would violate the Restraining Order and render Morris's security interest in MSG's stock

worthless.  *Id.*, PageID 119-121.  Charron used his law firm's security interest in MSG's assets so that his firm could act as a middleman in the transfer.  *Id.*, PageID 120.

On November 21, 2008, Charron's firm took possession of MSG's assets and sold them for an alleged $395,000.  *Id.*  When asked in December about the status of the assets, Charron responded, "If you believe he [Schnoor] has violated the [Restraining O]rder, let's have a shoot out so we may disclaim you of the notion."  *Id.*, PageID 121.  Charron also acknowledged that the Restraining Order prevented any transfers, though by this time, the assets were already gone. *Id.*

Upon learning that Charron may have violated its Restraining Order, the State Court held a hearing to determine whether to hold Charron in contempt, applying the clear and convincing evidentiary standard.  *Id.*, PageID 115-121, 124, 138.  The State Court found that Charron

(a)  had knowledge of the Restraining Order and its terms.  *Id.*, PageID 129.

(b)  was bound by the Restraining Order.  *Id.*

(c)  "siphoned all of the assets of MSG through his law firm and passed them on to NYPIA" in violation of the Restraining Order.  *Id.*

(d)  recognized the impropriety of his conduct.  *Id.*, PageID 130.

(e)  committed "a textbook example of contempt of court," in that he "recognized that a court order prohibited all transfers of MSG's assets outside the ordinary course of business . . . yet took actions on behalf of his client (MSG) and his own law firm that did precisely what the court order forbade."  *Id.*, PageID 129, 138.

(f)  "acted in contempt of the [Restraining Order] entered on August 22, 2008."  *Id.*, PageID 130, 138.

The State Court found that Charron's law firm (which Charron controlled) and MSG had caused Morris $1,368,000 in damages.  *Id.*, PageID 126-28, 131-133, 135.  It also found that Charron's

-5-

acts in contempt of court had caused Morris damages in legal fees and costs. *Id.*, PageID 130, 135. It found Charron liable for "$349,416 in attorney fees and $14,090.77 in court costs to Morris." *Id.*, PageID 141-47. The State Court issued these findings of fact and conclusions of law in an *Opinion and Order Setting Forth Findings of Civil Contempt* ("Contempt Opinion," *Id.*, PageID 115-35),[1] which detailed the basis for the finding of contempt itself, and an *Opinion and Order Awarding Attorney Fees to Plaintiff Glenn S. Morris and Against Attorney David W. Charron* ("Attorney Fee Opinion," *Id.*, PageID 137-47). The State Court entered a final judgment on the matter in favor of Morris and against Charron in the amount of $363,506.77 ("Final Judgment," *Id.*, PageID 149) on March 7, 2014. Morris's award was partially offset by a fee award in favor of Charron in the amount of $22,443.77 in Case 09-01878 pursuant to Michigan's offer of judgment rule. *Id.*, PageID 149, 159. These judgments net to $341,063.00 (the "Contempt Award").

The Michigan Court of Appeals affirmed the State Court's opinions, and the Michigan Supreme Court declined leave for any further appeals. *Morris v. Schnoor*, Nos. 315006, 315007, 315702, and 315742, 2014 WL 2355705 (Mich. Ct. App. May 29, 2014) (affirming State court) (attached to the Record at PageID 309-68); *Morris v. Schnoor*, 859 N.W.2d 514 (Mich. 2015). Thus, the Contempt Award itself is final, though Charron is still appealing the amount of the Contempt Award in the Michigan Court of Appeals.

Approximately one year after the Final Judgment was entered, Charron filed his bankruptcy petition. Record, PageID 51 (showing Petition Date of April 10, 2015). Morris responded by filing a complaint ("Complaint," *Id.*, PageID 102-113) seeking to hold the Contempt Award nondischargeable. Both parties moved for summary judgment. For filings

---

[1] The Contempt Opinion was signed on December 27, 2012. *Id.*, PageID 135. At 3:09 p.m. that afternoon, Charron faxed a certificate to the state, dissolving his law firm in an attempt to render the State Court's award of damages against his firm worthless. *Id.*, PageID 169-71.

related to Charron's motion for summary judgment, see "Charron Summary Judgment Motion," *Id.*, PageID 172-449; "Morris Summary Judgment Response," *Id.*, PageID 474-78; "Charron Summary Judgment Reply," *Id.*, PageID 481-90.   For filings related to Morris's motion for summary judgment, see "Morris Summary Judgment Motion," *Id.*, PageID 450-73; "Charron Summary Judgment Response 1," PageID 491-92; "Charron Summary Judgment Response 2," PageID 495-810.

In his filings, Morris noted that the facts necessary to a nondischargeability judgment had already been litigated in the State Court, decided against Charron, appealed by Charron, and affirmed against him.  The State Court found that Charron had willfully violated its Restraining Order, knowing this would harm Morris.  There was no need to retry the matter.  *See* Morris Summary Judgment Response and Morris Summary Judgment Motion.  The Bankruptcy Court agreed, granting Morris summary judgment and denying the Charron Summary Judgment Motion.   "Bankruptcy Court Summary Judgment Opinion," Record, PageID 11-36.   The Bankruptcy Court found that the Contempt Opinion and the Attorney Fee Opinion should be given preclusive effect, concluding that "This court's conclusion that the factual findings made by the state court are entitled to preclusive effect in this adversary proceeding is not only consistent with *Grenier* and other relevant case law, but also effectuates the underlying purposes of collateral estoppel." *Id.*, PageID 26-32 (quote found on PageID 31).

Charron moved the Bankruptcy Court to amend its findings of fact, asking it to add additional facts to its Bankruptcy Court Summary Judgment Opinion which might be helpful for this appeal ("Charron Motion to Amend," *Id.*, PageID 811-23).  He also moved the Bankruptcy Court to reconsider ("Charron Motion to Reconsider," *Id.*, PageID 827-51.)  The Bankruptcy Court denied both motions.  *Id.*, PageID 37-38.  The Bankruptcy Court wrote a memorandum

opinion explaining its reasoning for denying the motions ("Memorandum Opinion," *Id.*, PageID 39-49. The Bankruptcy Court explained that it had denied the Charron Motion to Amend because a trial court that grants summary judgment is not engaged in fact finding; it simply is holding that there is no genuine factual dispute and applying the law to the undisputed facts. *Id.*, PageID 40-42. It further declined to "re-characterize its factual summary of the proceedings in the state trial and appellate courts, and to add additional 'findings' based on [Charron's] view of the record in the state courts and in this adversary proceeding." *Id.*, PageID 43. After spelling out in more detail its reasoning behind the Bankruptcy Court Summary Judgment Opinion, the Bankruptcy Court concluded that the Charron Motion to Reconsider "merely re-states arguments that were previously considered by this Court" and thus provided no basis for reconsideration. *Id.*, PageID 44-49.

Charron now asks this Court to reinspect arguments that have been reviewed and rejected by the State Court, the Michigan Court of Appeals, and most recently, by the Bankruptcy Court in both the Bankruptcy Court Summary Judgment Opinion and the Memorandum Opinion.

## SUMMARY OF THE ARGUMENT

Charron repeats here the same arguments that have been thoroughly reviewed and repeatedly rejected by other courts. He conflates the award against him personally with actions against his firm, as if that would make the contempt judgment against him disappear. Charron insists that he, a licensed attorney, did not realize that a Restraining Order prohibiting his client from liquidating assets also applied to him. Charron maintains that forcing Morris to expend hundreds of thousands of dollars to protect his legal rights did not in any way harm Morris. And so on. Rather than get lost in the tangle of Charron's protestations, it makes sense to step back, as the Bankruptcy Court did, and figure out exactly which questions are actually before this Court.

Regardless of which statement of the issues one might prefer, the parties here agree that there are two issues before the Court. The first is whether summary judgment was proper or whether there was a genuine issue of material fact that precluded summary judgment. Charron Brief, Doc. No. 4, p. 1, Issue #2; this brief, p. 2, Issue #1. If there were no genuine issues of material fact, the second issue is to determine whether the established facts supported a judgment for nondischargeability. Charron Brief, Doc. No. 4, p. 1, Issue #1; this brief, p. 2, Issue #2.

As to whether summary judgment was proper, Sixth Circuit precedent and Michigan law make clear that when, as here, facts essential to a judgment have been fully and fairly litigated, they may not be relitigated in a subsequent proceeding. The State Court held two hearings. First, it held a hearing to determine whether Charron's actions rose to the level of contempt. Record, PageID 115. Having found that they did, the State Court held a second, five-day hearing on the amount to be awarded (*Id.*, PageID 138). The facts determined by the State Court were essential to its finding of Charron's contempt and its award to Morris. On review of this record, the Bankruptcy Court thus concluded that the facts set forth in the Contempt Opinion and the

-9-

Attorney Fee Opinion were essential to those opinions and could not be relitigated again by Charron in the Bankruptcy Court, no matter how strenuously Charron disagreed with the State Court's findings.

Regarding the issue of nondischargeability itself under 11 U.S.C. § 523(a)(6), for the Contempt Award to be nondischargeable, Charron must have caused "willful and malicious injury" to Morris or his property.  In short, (1) did Charron will or desire harm, or believe injury was substantially certain to occur as a result of his behavior, and (2) did injury actually occur?  The Bankruptcy Court correctly found both of these issues were satisfied.  A person who knowingly violates a protective order must believe that injury is substantially certain to occur.  Indeed, the purpose of a protective order is to *prevent* injury; to knowingly violate the order is to intend the injury that the order attempted to avert.  Charron, unlike many debtors, was forewarned exactly what behavior would cause harm—namely, disposal of MSG's assets—and he did it anyway.  The Bankruptcy Court further found that the contempt award to Morris was compensation for injuries Charron had inflicted on Morris.  Morris was not required to stand silent and let Charron get away with his misdeeds.  Thus, the Bankruptcy Court concluded that the facts determined by the State Court established that Charron had willfully and maliciously injured Morris, granting Morris summary judgment on the issue.

Charron continues to dispute all this, of course, but he had his day in State Court—many of them, in fact—and he lost.  He lost again on his appeal to the Michigan Court of Appeals, and the Michigan Supreme Court declined to take him up on his request to appeal further.  The Bankruptcy Court properly denied him the opportunity to relitigate the issues yet again.  This Court should do the same and affirm the judgment of the Bankruptcy Court.

For these reasons, Morris respectfully asks this Court to AFFIRM the judgment of the Bankruptcy Court below.

<u>**ARGUMENT**</u>

I.    <u>**LEGAL STANDARDS**</u>

    A.    **Non-dischargeability standard for violation of court orders.**

        1.    **Non-dischargeability standard under 11 U.S.C. § 523(a)(6) generally.**

> For the discharge exception under § 523(a)(6) to apply, a debtor must: (1) "will or desire harm[;]" or (2) "believe injury is substantially certain to occur as a result of his behavior." *Markowitz v. Campbell (In re Markowitz)*, 190 F.3d 455, 465 n.10 (6th Cir. 1999). The Supreme Court has said that "nondischargeability [under this subsection] takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury." *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998). This court has created a non-exclusive list of the "types of misconduct [that] satisfy the willful and malicious injury standard: intentional infliction of emotional distress, malicious prosecution, conversion, assault, false arrest, intentional libel, and deliberately vandalizing the creditor's premises." *Steier v. Best (In re Best)*, 109 Fed. Appx. 1, 5 & n.2 (6th Cir. 2004) (collecting cases). "[T]he injury must invade the creditor's legal rights . . . 'in the technical sense, not simply harm to a person.'"

*Musili v. Droomers (In re Musili)*, 379 Fed. Appx. 494, 498 (6th Cir. 2010). The Plaintiff must establish these elements by a preponderance of the evidence. *Trost v. Trost (In re Trost)*, 510 B.R. 140, 149 (Bankr. W.D. Mich. 2014).

        2.    **Debts incurred for violation of protective court orders are almost always non-dischargeable under 11 U.S.C. § 523(a)(6).**

Most Sixth Circuit "cases dealing specifically with the dischargeability of contempt judgments have been decided [] under § 523(a)(6), and have uniformly held that such judgments may constitute a nondischargeable debt." *Lowry v. Nicodemus (In re Nicodemus)*, 497 B.R. 852, 859-60 (B.A.P. 6th Cir. 2013) (collecting Sixth Circuit cases). "Other circuits have reached the same conclusion under § 523(a)(6)." *Id.* at 860 (collecting non-Sixth Circuit cases). Indeed, some courts have even held that debts incurred by a debtor's violation of a protective order are

*per se* nondischargeable because the debtor was warned *precisely* of what not to do.  The *Behn* court explained why, albeit in the context of violation of a federal restraining order.

> Specifically, when a court of the United States . . . issues an injunction or other protective order telling a specific individual what actions will cross the line into injury to others, then damages resulting from an intentional violation of that order (as is proven either in the bankruptcy court or (so long as there was a full and fair opportunity to litigate the questions of volition and violation) in the issuing court) are *ipso facto* the result of a "willful and malicious injury."

> This is because what is "just" or "unjust" conduct as between the parties has been defined by the court.  That is what a court of law does in certain injunctions.  An intentional violation of the order is necessarily without "just cause or excuse" and cannot be viewed as not having the intention to cause the very harm to the protected persons that order was designed to prevent.

> There are three safeguards for any debtor in this formulation. Firstly, the injunction or other protective order would, by law, have been issued in a judicial proceeding in which the debtor was a party who received at least the protections of Rule 65 F.R.Civ.P., if not more.   Secondly, the violation was shown to have been intentional.  And lastly, the elements of and size of the award were determined in accordance with well-settled standards applying to contempts.  That these three safeguards were provided in this case is beyond this Court's power to review, for the earlier orders are final.

> The subject matter of the injunction is irrelevant so long as the plaintiff in the § 523(a)(6) action was a protected party under the order.  It makes no difference whether, for example, the order protected the right of clinics or others to provide lawful medical procedures to its patients, or protected a woman from unwanted contact with an estranged spouse or a stalker, or protected one charged with a crime from being accosted by the father of the victim, or protected a business from disparagement of its name, <u>or protected a litigant from suffering its opponent's placing the object of the litigation out of reach</u>.

> So long as the federal court with jurisdiction over the person who later files bankruptcy, has issued an order for the protection of someone else, and has communicated it clearly to the contemnor, then an intentional violation is not only willful, but is also "malicious" per se.  The federal court has told the defendant the

> point at which lawful activity becomes "harm" under the law.  <u>To intend the violation is to intend the harm.  What "cause" or "excuse" might be "just" was considered by the court in fashioning the protective order, and is not to be re-litigated when deciding whether the violation was intentional</u>.

> Indeed, few debtors who are the subject of § 523(a)(6) complaints are so fortunate as to have been told by a federal court what actions would or would not be "just," before she acts.  Nothing more could be asked of a bankruptcy process that is designed to protect the debtor that is not merely "honest," but is also "unfortunate."

*Buffalo Gyn Womenservices, Inc. v. Behn (In re Behn)*, 242 B.R. 229, 238-39 (Bankr. W.D.N.Y. 1999) (footnotes omitted and underlining added).  This reasoning applies to violation of a state court protective order, where similar protections apply.

### 3. Debts that are non-dischargeable under 11 U.S.C. § 523(a)(6) include "any liability arising" from the prohibited conduct.

All debts that occur when a debtor violates a protective court order are not dischargeable. In other words, awards of attorneys' fees and the like are not dischargeable if they flow in any way from the violation.  Indeed, the Supreme Court has held that such a reading is not only plausible, but mandatory, when it analyzed another subsection of § 523.

> Section 523(a) defines several categories of liabilities that are excepted from discharge, and the words "debt for" introduce many of them, viz., "debt . . . for a tax or a customs duty . . . with respect to which a return . . . was not filed," § 523(a)(1)(B)(i), "debt . . . for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny," § 523(a)(4), "debt . . . for willful and malicious injury by the debtor to another entity," § 523(a) (6), and "debt . . . for death or personal injury caused by the debtor's operation of a motor vehicle if such operation was unlawful because the debtor was intoxicated," § 523(a)(9).  None of these use "debt for" in the restitutionary sense of "liability on a claim to obtain"; it makes little sense to speak of "liability on a claim to obtain willful and malicious injury" or "liability on a claim to obtain fraud or defalcation."  Instead, "debt for" is used throughout to mean "debt as a result of," "debt with respect to," "debt by reason of," and the like . . ., connoting broadly any liability arising from the specified object . . . .

-14-

> Because each use of "debt for" in § 523(a) serves the identical function of introducing a category of nondischargeable debt, the presumption that equivalent words have equivalent meaning when repeated in the same statute . . ., has particular resonance here. And contrary to petitioner's submission, it is of no moment that "debt for" in § 523(a)(2)(A) has as its immediate object a commodity (money, property, etc.), but in some of the other exceptions has as its immediate object a description of misconduct, *e.g.*, § 523(a)(4) ("debt for fraud or defalcation [by a] fiduciary"). Section 523(a)(2)(A) also describes misconduct ("false pretenses, a false representation, or actual fraud"), even if it first specifies the result of that conduct (money, property, etc., obtained). The exception in § 523(a)(9) is framed in the same way, initially specifying an outcome as the immediate object of "debt for" ("death or personal injury"), and subsequently describing the misconduct giving rise to that outcome ("operation of a motor vehicle [while] intoxicated"). It is clear that "debt for" in that provision means "debt arising from" or "debt on account of," and it follows that "debt for" has the same meaning in § 523(a)(2)(A). When construed in the context of the statute as a whole, then, § 523(a)(2)(A) is best read to prohibit the discharge of any liability arising from a debtor's fraudulent acquisition of money, property, etc., including an award of treble damages for the fraud.

*Cohen v. de la Cruz*, 523 U.S. 213, 219-21 (1998).

Thus, when a clear violation of a court's protective order has been proven, sanctions for legal fees and costs a debtor may incur in connection with the violation are non-dischargeable, even if no other injury has been shown. *Suarez v. Barrett (In re Suarez)*, 400 B.R. 732, 738 (B.A.P. 9th Cir. 2009) ("Established case law holds that a debtor's obligation for attorneys fees and costs is excepted from discharge under section 523(a)(6) as a 'debt for' debtor's willful and malicious injury when awarded by the state court 'with respect to' or 'by reason of' the same underlying conduct that precluded discharge of the underlying compensatory damages award."); *Star's Edge, Inc. v. Braun (In re Braun)*, 327 B.R. 447, 452 (Bankr. N.D. Cal. 2005) ("This court concludes that, under *Cohen v. de la Cruz*, Debtor's obligation to pay sanctions, attorney fees and cost to Plaintiffs is also nondischargeable under section 523(a)(6).")

B.    **Application of collateral estoppel to nondischargeability actions.**

> Collateral estoppel, also referred to as issue preclusion, precludes relitigation of issues of fact or law actually litigated and decided in a prior action between the same parties and necessary to the judgment, even if decided as part of a different claim or cause of action.  The whole premise of collateral estoppel is that once an issue has been resolved in a prior proceeding, there is no further factfinding function to be performed.  When the requirements of collateral estoppel are met, application of the doctrine encourages the parties to present their best arguments on the issues in question in the first instance and thereby saves judicial time.  If a party decides not to present facts or their best arguments at trial, adverse collateral estoppel consequences may result in subsequent bankruptcy litigation.

*Trost*, 510 B.R. at 150 (citations, alterations, emphasis, and internal quotation marks omitted).

> Collateral estoppel will apply where (1) the law of collateral estoppel in the state in which the issue was litigated would preclude relitigation of such issue, and (2) the issue was fully and fairly litigated in state court.
>
> Under Michigan law, collateral estoppel precludes the relitigation of an issue in a subsequent, different cause of action between the same parties where the prior proceeding culminated in a valid, final judgment and the issue was actually litigated and necessarily determined.  An issue is actually litigated if it is put into issue by the pleadings, submitted to the trier of fact, and determined  by the trier of fact.  An issue is necessarily determined if it is essential to the judgment.

*Markowitz v. Campbell (In re Markowitz)*, 190 F.3d 455, 461-62 (6th Cir. 1999) (citations and footnotes omitted).

Collateral estoppel may be used to establish nondischargeability under § 523(a)(6).  *Musili*, 379 Fed. Appx. at 498-500; *Trost*, 510 B.R. at 150-52.  Here, collateral estoppel will apply if the "actual findings that were necessary to the prior determination . . . convincingly establish that the Defendants' actions were also willful and malicious under § 523(a)(6)."  *Trost*, 510 B.R. at 152.

-16-

Even if it is not entirely certain that collateral estoppel applies, summary judgment still should be entered against a debtor if the record makes it "clear that the actions taken by [the debtor] that led to [his] being held in contempt by the state court constitute willful and malicious injury." *Musili*, 279 Fed. Appx. at 498. The record is clear if it shows that the state court held that the debtor's "transfer of funds . . . was in 'willful disregard or disobedience of a court order[,'] that the contempt of court had directly damaged [a person]," and that the debtor "knew that [his] violation of the court order and the transferring of the assets" would injure the person. *Id.* at 497; *see also Behn*, 242 B.R. at 238-39 (holding that a violation of a clearly communicated restraining order is a *per se* violation and may not be relitigated).

### C.  Putting it all together – the *Musilli* case.

The Sixth Circuit *Musilli* case puts all of these factors together and is almost directly on point with the circumstances presently before the Court. 379 Fed. Appx. 494. In *Musilli*, two attorneys, Musilli and Baumgardner, were shareholders in a law firm. *Id.* at 495. The firm successfully represented plaintiffs in a suit against General Motors, earning over $1 million for doing so. *Id.* Warren Droomers[2] believed he was entitled to a referral fee for the case, and so he filed a state court lawsuit against the firm to collect it. *Id.*

Droomers asked the court to order that the amount at issue be placed in escrow during the suit. *Id.* The court did so, but the firm did not comply. *Id.* Instead, the firm transferred money to its shareholders, including Musilli and Baumgardner. *Id.* The state court eventually found for Droomers on a theory of quantum meruit. *Id.*

The court held a hearing to determine whether Musilli and Baumgardner should be held in contempt for failing to comply with its protective escrow order. *Id.* The court ruled at the

---

[2] Warren passed away during the litigation and was succeeded as a plaintiff by his wife, Barbara. Here, "Droomers" refers alternately to Warren or Barbara, as appropriate.

hearing that Musilli and Baumgardner "flagrantly violated" its order, awarding Droomers damages. *Id.* at 496. That same day, Musilli's and Baumgardner's law firm filed for bankruptcy protection. *Id.*

Droomers, Musilli, and Baumgardner entered into a settlement, wherein Musilli and Baumgardner would each pay Droomers $100,000 and the case would be dismissed. *Id.* Droomers performed her end of the bargain. *Id.* Rather than comply with their part of the settlement, however, Musilli and Baumgardner filed suit in federal court, asserting extortion and other claims. *Id.* The federal suit was dismissed as frivolous and the state suit reinstated. *Id.*

Shortly thereafter, Musilli and Baumgardner each filed for bankruptcy protection. *Id.* Droomers filed an adversary proceeding to have their collective debt to her declared nondischargeable. *Id.* The bankruptcy court did not enter a definitive finding regarding whether collateral estoppel applied, but found that the requirements of § 523(a)(6) had been met, and thus held the debt to Droomers nondischargeable. *Id.*

> The bankruptcy court found that the Michigan courts held that the appellants' transfer of funds from the firm was in "willful disregard or disobedience of a court order" and that the contempt of court had directly damaged Droomers. Further, it found that "[t]he record establishes that Musilli and Baumgardner knew that their violation of the court order and the transferring of the assets of [the firm] to themselves and others would injure Droomers."

*Id.* at 496-97. The matter was upheld on appeal to the District Court. *Id.* at 497.

On review, the Sixth Circuit noted that "For the discharge exception under § 523(a)(6) to apply, a debtor must: (1) 'will or desire harm;' or (2) 'believe injury is substantially certain to occur as a result of his behavior.'" *Id.* at 498 (quoting *Markowitz v. Campbell (In re Markowitz)*, 190 F.3d 455, 465 n.10 (6th Cir. 1999)) (alterations omitted). The Sixth Circuit agreed that there was some question as to whether collateral estoppel applied, yet nonetheless "it is clear that the actions taken by Musilli and Baumgardner that led to their being held in contempt by the state

-18-

court constitute willful and malicious injury." *Id.*  The court found "that the [state] court's escrow order made clear that 'injury was substantially certain to occur should Musilli and Baumgardner violate it." *Id.* at 499 (alterations omitted).

> Musilli and Baumgardner point to no facts in the record that refute this finding.  Despite having clear instructions from the court that the firm was to escrow funds sufficient to cover a judgment against it, Musilli and Baumgardner transferred all of the firm's assets away from the firm, including transferring a significant amount of money to themselves.  The appellants directly violated the court order and have offered no legitimate justification that might explain why their actions were not willful and malicious.  Therefore, we affirm the bankruptcy court's grant of summary judgment for Droomers on her claim that the debt is nondischargeable under § 523(a)(6).

*Id.*  Thus, even where application of collateral estoppel was not entirely clear, where the record made it clear that licensed attorneys had violated a court order, knowing that doing so would hurt an opposing litigant, the debts they incurred as a result were nondischargeable.

## II.   ARGUMENT

### A.   The *Musilli* decision makes it plain that the Contempt Award against Charron is nondischargeable.

Here, the situation is similar to that described in *Musilli*.  The state court ordered Schnoor not to transfer MSG's assets outside of the ordinary course of business.  Record, PageID 118.  The order bound Charron because he was Schnoor's attorney, and Charron knew that.  *Id.*, PageID 120-122, 129-130.  Despite this knowledge, Charron transferred away all of MSG's assets, committing "a textbook example of contempt of court," in that he "recognized that a court order prohibited all transfers of MSG's assets outside the ordinary course of business . . . yet took actions on behalf of his client (MSG) and his own law firm that did precisely what the court order forbade." *Id.*, PageID 129.

Violation of the court order was certain to cause harm, as Charron, a licensed attorney, well knew.  *Id.*, PageID at 120-122, 129-130; *Behn*, 242 B.R.at 238-39; *Musilli*, 379 Fed. Appx. at 499; *Nicodemus*, 497 B.R. at 859-60.  The fact that some damages were also awarded against Charron's law firm and MSG does not render the contempt sanctions against Charron any less a result of Charron's bad acts.  *Cohen*, 523 U.S. at 219-21; *Suarez*, 400 B.R. at 738; *Braun*, 327 B.R. 447 at 452.  The contempt sanctions were compensation for an injury, one which Charron willfully and maliciously inflicted.  As such, the contempt sanctions are nondischargeable pursuant to 11 U.S.C. § 523(a)(6).

The issue of whether Charron violated the Restraining Order was essential to the contempt finding, was litigated thoroughly between the same parties before the Court today, and culminated in a valid and final judgment.  *Morris*, 2014 WL 2355705 (Record, PageID 309-68); *Morris*, 859 N.W.2d at 514; *Markowitz*, 190 F.3d at 461-62.  As such, it has preclusive effect. *Markowitz*, 190 F.3d at 461-62.  Even if questions should remain regarding the application of collateral estoppel (which seems unlikely), the state court record was sufficiently established to support entry of a judgment of nondischargability.  *Musilli*, 379 Fed. Appx. at 498.

### B.    Charron's arguments do not change the outcome under *Musilli*.

The argument Charron makes in his appellant brief do not alter this outcome.  ("Charron Brief," Doc. No. 4.)  Morris will briefly explain why this is so.  Charron first argues that the standard for nondischargeability under § 523(a)(6) is high.  Charron Brief, pp. 12-14.  This is true, but Charron's acts surmounted this high standard.  He next argues that contempt sanctions are not nondischargeable *per se*.  *Id.*, pp. 14-15.  Again, true, but, it is equally true that contempt sanctions can be nondischargeable if they satisfy a subsection of section 523(a).  Charron suggests that *Musilli* stands for the proposition that "all debts resulting from contempt are willful and malicious *per se*," (*Id.*, p. 15) and to that extent the holding is incorrect.  To the contrary,

*Musilli* simply holds that a certain kind of contempt sanction—willful violation of a protective order—is nondischargeable.[3]  This is precisely what Charron did.

Charron criticizes the Bankruptcy Court for failing to properly analyze the authorities cited by the State Court, but this argument ignores the fact the state appellate courts had already done so and ruled against him.[4]  *Morris*, 2014 WL 2355705 (Record, PageID 309-68); *Morris*, 859 N.W.2d at 514.  The Bankruptcy Court correctly followed the footsteps of these courts.

Charron next complains that his conduct had been adjudged not to have harmed Morris.  Charron Brief, pp. 16-18.  He has consistently made this claim, and every court to which he has made it has seen through it.  The fact that an entirely different matter against Charron was dismissed has no bearing on the fact that Charron was ultimately held in contempt by the State Court.  Morris cannot explain it any better than the Bankruptcy Court already has:

> [T]he Debtor's motion for reconsideration argues that this Court's prior opinion ignored the significance of the state trial court's dismissal of the fraudulent conveyance claim brought by the Plaintiffs against the Debtor.  This Court disagrees.  The basis of this Court's nondischargeability determination was the state court's finding that the Debtor acted in contempt of the Injunctive Order and was therefore responsible for $363,506.77 in attorney fees and costs that were incurred by the Plaintiffs in connection with the contempt proceedings.  As explained in this Court's opinion, this finding of civil contempt and award of damages was entirely separate and distinct from the state court's determination that the Debtor was entitled to summary judgment on the fraudulent conveyance claims against him.

Record, PageID 91.

---

[3] For that matter, Charron cannot simply assert that *Musilli* is incorrect.  Charron is in no position to reverse the Sixth Circuit.  Had that court held that all contempt sanctions were nondischargeable *per se*, lower courts in this Circuit would still take guidance from the opinion.

[4] To the extent Charron is suggesting that the Bankruptcy Court should have reviewed the State Court's findings in any way, such review would be prevented by the *Rooker-Feldman* doctrine.  *See Alworth v. Levy (In re Levy)*, 250 B.R. 638, 643 (Bankr. W.D. Tenn. 2000).

Charron next complains that the type of contempt sanction applied to him was not a "tort" in the sense envisioned by § 523(a)(6), citing *In re Bradley Estate* and MCL § 600.1721. Charron Brief, pp. 18-21. This argument has already been rejected by the Michigan Court of Appeals as fallacious. *Id.*, PageID 328 (explaining why "[r]eliance on *In re Bradley Estate* is unavailing . . . ."). The Bankruptcy Court explicitly noted this holding in its Memorandum Opinion when it overruled the Charron Motion to Reconsider.[5] *Id.*, PageID 45-46. There is no reason for the Court to do otherwise.

Next, Charron insists that collateral estoppel <u>does</u> apply, but should work in his favor, and bring a determination that his contempt sanction was not based in tort. Charron Brief, pp. 22-23. As explained in the preceding paragraph, that assertion reads the state court rulings completely backwards. The Bankruptcy Court was not fooled by this claim; this Court should not be fooled, either.

Charron then tries to distinguish *Musilli* by saying that, in *Musilli*, the attorneys were put on notice that a protective order applied to them, whereas he had <u>no idea</u> that the Restraining Order forbade him from liquidating MSG's assets. Charron Brief, pp. 23-25. The Start Court found that statement to be untrue, holding that Charron "recognized that a court order prohibited all transfers of MSG's assets outside the ordinary course of business . . . yet took actions on behalf of his client (MSG) and his own law firm that did precisely what the court order forbade." Record, PageID 129. He cannot now challenge or change this established fact. *E.g.*, *Trost*, 510 B.R. at 152. Indeed, had the Bankruptcy Court actually taken testimony on this issue, it would have been an impermissible collateral attack on a final state court judgment. *Alworth v. Levy (In re Levy)*, 250 B.R. 638, 643 (Bankr. W.D. Tenn. 2000).

---

[5] Indeed, Charron's vexation repetition of arguments that have been firmly and finally decided against him has dragged out this litigation for nearly a decade.

Charron repeats this claim as a reason for why *Suarez* is distinguishable, claiming he was never warned that his liquidation of MSG assets was barred by the Restraining Order. Charron Brief, pp. 25-26. This goes against the findings of the State Court and against common sense. As the *Behn* court noted, a restraining order spells out what conduct is prohibited in an attempt to prevent harm from occurring. *Behn*, 242 B.R. at 238-39. Charron had the luxury of knowing in advance that his conduct would be harmful, and yet he did it anyway.

Charron's penultimate complaint—that the Bankruptcy Court erred in making factual findings—fails for two reasons. First, as the Bankruptcy Court itself noted, the Bankruptcy Court made no findings of its own. Record, PageID 87-88. It merely applied the record from the state proceedings. *Id.* As Charron well knows, and the Bankruptcy Court docket confirms, the Bankruptcy Court never held any evidentiary hearings or received evidence of any kind. *Id.*, PageID 51-56. Second, Charron already had his chance to provide testimony and attempt to prove that he caused no injury. Charron Brief, pp. 27-28. The State Court gave him a hearing on this issue and determined this issue against him, as discussed at length in the Contempt Opinion, the Attorney Fee Opinion, and the Final Judgment. The Bankruptcy Court would have committed legal error had it indulged Charron and given him yet another bite at this well-chewed apple. *Levy*, 250 B.R. at 643.

At the end, Charron says that his actions were all one big mistake. *Id.*, p. 29. Even he admits here that he "argued <u>unsuccessfully</u> that the state court should interpret MCR 3.310(C)(4)[, which describes the scope of a Michigan state court injunction,] in the same manner that federal courts interpret F R Civ P Rule 65(d) . . . ." *Id* (emphasis added). Indeed, this argument was unsuccessful at the state court level, and he should not be raising it yet again at the federal level. Record, PageID 316-20; *Levy*, 250 B.R. at 643. In both Michigan and

Federal courts, attorneys are bound by orders that restrain their clients.  *Candler v. Wallace Candler, Inc.*, 365 B.R. 613, 620 (1962); *SEC v. Bilzerian*, 613 F. Supp.2d 66, 72-73 (U.S.D.C. 2009) (holding attorney in contempt for violation of court order, finding that notice of the order sufficed, regardless of whether or not the attorney represented the party in that particular matter).  As an attorney himself, Charron's argument to the contrary is either a violation of his duty of candor to this Court, or else a convincing admission of incompetence.  Either way, neither this argument nor any of his others absolves him of his knowing and willful violation of the Restraining Order, and the nondischargeabilty judgment that resulted.

## III.   CONCLUSION

The State Court told Charron what he was not to do.  He did it anyway, knowing harm would result.  He must live with the consequences of this choice.  Charron was unsuccessful in justifying his actions to the State Court, whose order he violated.  He was unsuccessful in the state appellate courts and the Bankruptcy Court.  He will not succeed here.

For the reasons stated herein, Morris asks this Court to AFFIRM the judgment of the Bankruptcy Court and grant such other relief as this Court deems proper.

Respectfully submitted,

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

By:   /s/ Ronald A. Spinner
     Stanley J. Stek (P29332)
     Eric D. Carlson (P60277)
     Ronald A. Spinner (P73198)
     Attorneys for Glenn S. Morris and the
     Glenn S. Morris Trust
     150 West Jefferson, Suite 2500
     Detroit, MI  48226
     (313) 496-7829
     spinner@millercanfield.com

Dated:  March 23, 2016

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on March 23, 2016, the *Appellee Glenn S. Morris and the Glenn S. Morris Trust's Brief on Appeal* was served upon counsel for Appellant David Charron at the address via first class United States mail and via ECF email service.

Dunn, Schouten & Snoap PC
Attn:  Perry G. Pastula
2745 DeHoop Ave SW
Grand Rapids, MI 49509

By:  /s/ Ronald A. Spinner
  Stanley J. Stek (P29332)
  Eric D. Carlson (P60277)
  Ronald A. Spinner (P73198)
  Attorneys for Glenn S. Morris and the
  Glenn S. Morris Trust
  150 West Jefferson, Suite 2500
  Detroit, MI  48226
  (313) 496-7829
  spinner@millercanfield.com